USDC SCAN INDEX SHEET

Five Navy Seals, et al v. Associated Press, et al Doc.

BAR 4/11/05 14:33

3:05-CV-00555 FIVE NAVY SEALS V. ASSOCIATED PRESS

*6*

*P/A.*

Dockets.Justia.com

FILED
05 APR -8 AM 11:45
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Robert G. Steiner, State Bar No. 027684
Gregory D. Roper, State Bar No. 087019
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Facsimile No.: 619.232.8311

David A. Schulz (pro hac vice pending)
Seth D. Berlin
Audrey Critchley, State Bar No. 228119
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
230 Park Avenue, Suite 1160
New York, New York 10169
Telephone No.: 212.850.6100
Facsimile No.: 212.850.6299

Attorneys for DEFENDANTS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FOUR NAVY SEALS AND JANE DOE,

Plaintiffs,

v.

ASSOCIATED PRESS, a New York Corporation; SETH HETTENA, an individual; and Does 1 through 50, inclusive,

Defendants.

Case No. 05 CV 0555 JM (JMA)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND STRIKE THE FIRST AMENDED COMPLAINT**

Date: May 6, 2005
Time: 11:00 a.m.
Ctrm.: 6

Hon. Jeffrey T. Miller

Complaint filed: March 21, 2005

**ORIGINAL**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........ 1

BACKGROUND TO THIS DISPUTE ........ 2

- A. Circumstances Surrounding the Challenged News Report ........ 2
- B. The Claims Asserted Against AP ........ 4

ARGUMENT ........ 7

I. PLAINTIFFS HAVE NO CLAIM FOR INVASION OF PRIVACY ........ 7

- A. The Complaint States No Claim For Disclosure of Private Facts ........ 7
- B. The Complaint States No Claim for Intrusion Upon Seclusion ........ 11

II. PLAINTIFFS' CLAIMS FOR INVASION OF PRIVACY SHOULD BE STRICKEN PURSUANT TO THE CALIFORNIA "ANTI-SLAPP" STATUTE IN ANY EVENT ........ 15

III. PLAINTIFFS HAVE NO CLAIM FOR COPYRIGHT INFRINGEMENT ........ 17

- A. The Copyright Claim Is Insufficient Under Fed. R. Civ. P. 8 ........ 18
- B. AP's Report Was a Non-Infringing Fair Use of Any Copyrighted Photograph ........ 19
  1. Purpose of the Use ........ 20
  2. Nature of the Original Work ........ 21
  3. The Amount Taken ........ 22
  4. Effect on the Market ........ 23
  5. Aggregation of the Factors ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .......... 16

*Beilenson v. Superior Court*,
44 Cal. App. 4th 944 (1996) .......... 17

*BESPAQ Corp. v. Haoshen Trading Co.*,
2005 WL 14841 (N.D. Cal. Jan. 3, 2005) .......... 18

*Braun v. Chronicle Publ'g Co.*,
52 Cal. App. 4th 1036 (1997) .......... 15

*Brewer v. Hustler Magazine, Inc.*,
749 F.2d 527 (9th Cir. 1984) .......... 8

*Brown v. Adidas Int'l*,
938 F. Supp. 628 (S.D. Cal. 1996) .......... 18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 20, 23

*Cervantes v. City of San Diego*,
5 F.3d 1273 (9th Cir. 1993) .......... 19

*Cf. In re Christian S.*,
7 Cal. 4th 768 (1994) .......... 13

*Church of Scientology v. Wollersheim*,
42 Cal. App. 4th 628 (1996) .......... 17

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 11

*Daly v. Viacom, Inc.*,
238 F. Supp. 2d 1118 (N.D. Cal. 2002) .......... 9

*DuPont Merck Pharm. Co. v. Superior Court*,
78 Cal. App. 4th 562 (2000) .......... 17

*Equilon Enters., LLC v. Consumer Cause, Inc.*,
29 Cal. 4th 53 (2002) .......... 16

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989) .......... 11

*Flynn v. Health Advocate, Inc.*,
2004 WL 51929 (E.D. Pa. Jan. 13, 2004) .......... 18, 19

*Forsher v. Bugliosi*,
26 Cal. 3d 792 (1980) ........ 8

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ........ 10

*Gates v. Discovery Communications, Inc.*,
34 Cal. 4th 679 (2004) ........ 11

*Gee v. CBS, Inc.*,
471 F. Supp. 600 (E.D. Pa. 1979) ........ 18

*Getaped.Com, Inc. v. Cangemi*,
188 F. Supp. 2d 398 (S.D.N.Y. 2002) ........ 21

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
63 F. Supp. 2d 1127 (N.D. Cal. 1999) ........ 16

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) ........ 19

*J.S. ex rel. H.S. v. Bethlehem Sch. Dist.*,
757 A.2d 412 (Pa. Commw. 2000) ........ 12

*Jarrow Formulas, Inc. v. LaMarche*,
31 Cal. 4th 728 (2003) ........ 16

*Johnson v. Harcourt, Brace, Jovanovich, Inc.*,
43 Cal. App. 3d 880 (1974) ........ 7

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ........ 21, 23, 24

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ........ 3

*Konop v. Hawaiian Airlines, Inc.*,
236 F.3d 1035 (9th Cir. 2001) ........ 12

*Kulik Photography v. Cochran*,
975 F. Supp. 812 (E.D. Va. 1997) ........ 20

*Lamb v. Starks*,
949 F. Supp. 753 (N.D. Cal. 1996) ........ 19, 24

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998) ........ 24

*Leidholdt v. L.F.P. Inc.*,
860 F.2d 890 (9th Cir. 1988) ........ 9

*Los Angeles News Serv. v. CBS Broadcasting, Inc.*,
305 F.3d 924 (9th Cir. 2002) ........ 22

*Ludwig v. Superior Court*,
37 Cal. App. 4th 8 (1995) ........ 15

*Maheu v. CBS Inc.*,
201 Cal. App. 3d 662 (1988) ........ 11

*Marich v. MGM/UA Telecommunications, Inc.*,
113 Cal. App. 4th 415 (2003) ........ 12, 16

*Martinez v. Metabolife Int'l, Inc.*,
113 Cal. App. 4th 181 (2003) ........ 16

*Mathieson v. Associated Press*,
23 U.S.P.Q. 2d 1685 1992 WL 164447 (S.D.N.Y. June 24, 1992) ........ 23

*Matson v. Dvorak*,
40 Cal. App. 4th 539 (1995) ........ 16

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ........ 22, 23, 24

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*,
306 F.3d 806 (9th Cir. 2002) ........ 12, 14

*Melvin v. Reid*,
112 Cal. App. 285 (1931) ........ 7

*Metabolife Int'l, Inc. v. Wornick*,
264 F.3d 832 (9th Cir. 2001) ........ 15, 17

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002) ........ 16

*New.Net, Inc. v. Lavasoft*,
356 F. Supp. 2d 1090 (C.D. Cal. 2004) ........ 16

*Nicholson v. McClatchy Newspapers*,
177 Cal. App. 3d 509 (1986) ........ 14

*Nicosia v. De Rooy*, 72 F. Supp.
2d 1093 (N.D. Cal. 1999) ........ 15, 17

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) ........ 20, 21, 22, 23

*Parrino v. FHP, Inc.*,
146 F3d 699 (9th Cir. 1998) ........ 3

*Pasadena Star-News v. Superior Court*,
203 Cal. App. 3d 131 (1988) ........ 10

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) ........ 10

*Porten v. Univ. of San Francisco*,
64 Cal. App. 3d 825 (1976) .......... 8

*Price v. Viking Press, Inc.*,
625 F. Supp. 641 (D. Minn. 1985) .......... 8

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997) .......... 13

*Ross v. Burns*,
612 F.2d 271 (6th Cir. 1980) .......... 8

*Salazar v. Golden State Warriors*,
2000 WL 246586 (N.D. Cal. Feb. 29, 2000) .......... 11

*Sanders v. Am. Broad. Cos.*,
20 Cal. 4th 907 (1999) .......... 14

*Shulman v. Group W Prods., Inc.*,
18 Cal. 4th 200 (1998) .......... passim

*Shulman v. Group W. Prod., Inc.*,
59 Cal. Rptr. 2d 434 (1997) .......... 13

*Sipple v. Chronicle Publ'g Co.*,
154 Cal. App. 3d 1040 (1984) .......... 7, 8

*Sipple v. Foundation for National Progress*,
71 Cal. App. 4th 226 (1999) .......... 17

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) .......... 11

*Thomas v. Fry's Electronics, Inc.*,
-- F.3d --, 2005 WL 589586 (9th Cir. Mar. 15, 2005) .......... 16

*Thomas v. Los Angeles Times Communications, LLC*,
189 F. Supp. 2d 1005 (C.D. Cal. 2002) .......... 15, 17

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 10

*U.S. v. Lifshitz*,
369 F.3d 173 (2d Cir. 2004) .......... 12

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
190 F.3d 963 (9th Cir. 1999) .......... 16

*United States v. Gines-Perez*,
214 F. Supp. 2d 205 (D.P.R. 2002) .......... 12

*Wilkins v. National Broadcasting Co.*,
71 Cal. App. 4th 1066 (1999) .......... 10

**FEDERAL STATUTES**

151 Cong. Rec. S3009 ........ 6
17 U.S.C. § 107 ........ 19, 20
17 U.S.C. § 107(1) ........ 20
17 U.S.C. § 107(4) ........ 23
Fed. R. Civ. P. 12(b)(6) ........ 9, 11, 19
Fed. R. Civ. P. 8 ........ 18, 19

**STATE STATUTES**

Cal. Civ. Proc. Code § 425.16(b)(1) ........ 15
Cal. Civ. Proc. Code § 425.16(e)(2) ........ 15
Cal. Civ. Proc. Code § 425.16(e)(4) ........ 15
Cal. Code Civ. Proc. § 425.16(a) ........ 15
Cal. Code Civ. Proc. § 425.17(d)(1) ........ 16

**OTHER AUTHORITIES**

*Restatement (Second) of Torts* § 652B ........ 11
*Restatement (Second) of Torts* § 652D, cmt. b ........ 8
*Restatement (Second) of Torts* § 652D, cmt. h ........ 9

## PRELIMINARY STATEMENT

This action improperly seeks to punish the Associated Press ("AP") and its reporter Seth Hettena (collectively "defendants") for truthfully reporting on a Navy investigation into possible misconduct by the plaintiffs and others. Plaintiffs are four Navy SEALS and one of their wives, who object to an AP news report about photos of Iraqi prisoners, apparently taken by Navy SEALS, that were found posted on the World Wide Web.

Taking such unofficial photos of prisoners is itself a violation of Navy regulations, and possibly of the Geneva Conventions. Upon learning of the photographs, the Navy immediately launched an investigation into *both* the taking of the photos *and* the conduct depicted in the photos, which showed bloodied prisoners, prisoners posed with guns pointed at their heads, and SEALS mugging for the cameras while sitting atop hooded prisoners. The existence of these photos and their public availability on the Internet was highly newsworthy, particularly in the context of allegations of abuse previously leveled against certain elements of the U.S. military in Iraq. These allegations include charges that nine SEALS had, among other things, abused a prisoner and then improperly posed for photos with him– the same type of activity apparently depicted in some of the photos posted on the Internet.

AP's reporting was truthful, accurate and balanced. Some of the SEALS nonetheless seek to shift attention from their conduct to that of the AP, by asserting that a true news report about conduct of U.S. forces while on active duty invaded their personal privacy, and advancing a strained copyright infringement claim in order to invoke federal jurisdiction. This obvious effort to chill AP's reporting should be rejected, and the Complaint promptly dismissed.

As set forth below, the privacy claims advanced by plaintiffs stretch notions of privacy far beyond anything ever previously recognized, and in a manner that would flatly violate defendants' First Amendment right to gather and publish the news. The common law and constitutional claims advanced by four Navy SEALS alleging public disclosure of photos with their images are facially invalid, because the photos were not private at the time AP reported on them and the disclosures were, in any event, proper, newsworthy and of legitimate public

concern. The claim for intrusion advanced by Jane Doe[1] for copying photos from a web page she created similarly fails, because defendants did not "intrude" upon any private place and their newsgathering activity – on a matter of great public concern – cannot be considered "highly offensive" as a matter of law. The tag-along copyright claim is equally deficient for a number of reasons, including that the allegations in the Complaint establish AP's use of the photos in its news report to be a "fair use," expressly permitted under the Copyright Act.

Because the privacy claims advanced by plaintiffs seek to punish a news organization for reporting on a public issue, they are governed by California's anti-SLAPP statue. This statute requires plaintiffs to demonstrate a probability that they can succeed on their claims, before they may even proceed to discovery. On the facts alleged, plaintiffs cannot possibly make this mandatory showing and for this reason, too, the claims should be dismissed.

Plaintiffs may not have intended that photos of them posing with prisoners would ever make their way onto the Internet, but they do not have a claim against the AP for truthfully reporting on the existence of the photos and the Navy investigation they provoked.

## BACKGROUND TO THIS DISPUTE

### A. Circumstances Surrounding the Challenged News Report

The relevant facts are more fully set forth in the accompanying declaration of AP reporter Seth Hettena ("Hettena Decl."), and are summarized here only in brief.

The AP report challenged in this lawsuit was written in the context of other investigations looking into possibly illegal conduct by U.S. troops in Iraq. One now infamous event involved the death of a prisoner just hours after he was delivered by Navy SEALS to the Abu Ghraib prison in late 2003. (Hettena Decl. ¶ 6.) AP reporter Seth Hettena is covering the prosecution of nine SEALS and a petty officer in connection with this death. These SEALS have been charged with a number of crimes, including assault, failure to disclose abuse, and illegally taking photographs of the prisoner. (Hettena Decl. ¶¶ 6-7.) While covering these prosecutions, Hettena discovered on a public Internet website scores of photos of SEALS in

---

[1] All plaintiffs have filed their Complaint anonymously, although the court record does not reflect any request for permission to do so.

Iraq, many posing with hooded and bloodied prisoners. (Hettena Decl. Ex. A.) The website was found through a simple Google search, could be accessed without a password, and permitted anyone to view, download and purchase copies of the photos through the mail. (Hettena Decl. ¶¶ 10-13, 18.) When the website was brought to the attention of the Navy by Hettena, the Navy launched an immediate investigation.

AP's initial report disclosing the existence of the photographs and the Navy investigation is challenged in this lawsuit. (A copy of the AP news report and a complete set of the photos transmitted to AP members are annexed to the Hettena Declaration as Exhibits A & E for the Court's reference.[2]) The AP report explained that more than forty new pictures showing Navy SEALS posing with detainees in Iraq had been found by an AP reporter "posted on a commercial photo-sharing web site by a woman who said her husband brought them from Iraq after his tour of duty." The report quoted Navy Commander Jeff Bender:

> These photographs raise a number of important questions regarding the treatment of prisoners of war (POWs) and detainees. . . . I can assure you that the matter will be thoroughly investigated.

The article noted that some of the photos recalled "aspects of the images from Abu Ghraib," but also cautioned that the photographs "do not necessarily show anything illegal." The account quoted a former Marine Corp prosecutor and judge describing the images as "stupid" and "juvenile" behavior, but again noted the behavior was "not necessarily a crime." The AP also quoted the Navy's former Judge Advocate General, who offered the opinion that the photographs possibly violated the Geneva Convention, and expressed his concern that "[o]nce you start allowing that kind of behavior, the next step is to start posing the POWs in order to get even better pictures."

---

[2] The Complaint references the AP news report and photographs together with the smugmug.com User Agreement (Compl. ¶¶ 9-10, 18.) The Court may properly take notice of these documents on a Rule 12(b)(6) motion. *Parrino v. FHP, Inc.*, 146 F3d 699, 706 n.4 (9th Cir. 1998) (incorporation by reference doctrine allows court to consider on Rule 12(b)(6) motion documents whose contents are alleged in a Complaint and whose authenticity is not questioned); *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005).

AP transmitted the news report prepared by Hettena and several of the photos to its member newspapers and broadcast stations for their possible use. AP transmitted the photos exactly as they appeared on the Internet, consistent with AP's long-standing policy against altering news photographs in any way.[3] As the Complaint alleges (¶ 9), editors across the country found the report highly newsworthy and "virtually every major American newspaper" chose to publish it.[4]

AP transmitted a follow-up report the next Monday, to describe the Navy's initial assessment that some of the photos may have been taken for legitimate intelligence-gathering purposes and showed commandos using approved procedures. (Hettena Decl. Ex. F.) The following day AP prepared a further report to convey comments by the Secretary of the Navy cautioning against forming conclusions about the photos before the Navy's investigation was completed. (Hettena Dec. Ex. G.) Finally, two weeks later, the AP reported the Navy's announcement that its preliminary investigation into the photographs had led it to open a Command-level investigation that might result in disciplinary proceedings. (Hettena Decl. Ex. H.)

**B. <u>The Claims Asserted Against AP</u>**

Shortly after the Navy announced its expanded investigation, plaintiffs filed a state court Complaint against AP, with great fanfare, using the week between Christmas and New Year's Eve to blanket the Nation's news rooms with a press release announcing the filing of their lawsuit, and trumpeting plans to obtain immediate injunctive relief. (Schulz Decl. Ex. F.) Plaintiffs never served that state court Complaint. Instead, three months later they moved their lawsuit to this Court, refining their privacy theories and adding a single claim for copyright infringement.

/ / /

---

3 Some faces of prisoners are obscured by black dots in the photos. This is how the photos appeared on the Internet. (Hettena Decl. ¶ 14.)

4 AP does not provide news directly to the public, but is a source of news for newspapers, radio and television stations, cable networks, and Internet service providers, who independently elect whether to use the material provided to them by AP. *See* Hettena Decl. ¶ 3.

The first cause of action establishes federal jurisdiction by accusing AP of copyright infringement through the publication of one unidentified photograph out of five unidentified photographs for which copyright registrations have allegedly been obtained by one of the unnamed plaintiffs. The Complaint asserts that the allegedly infringed photograph was taken from some 1800 photos posted to the Internet by Jane Doe. (Compl. Intro.)

The Complaint then advances two theories of privacy allegedly invaded by AP: (1) it claims the Four Navy SEAL plaintiffs had a privacy interest in their identities as "covert operatives in Iraq" (Compl. ¶ 45); and (2) it claims the Jane Doe plaintiff had "an objectively reasonable" expectation of privacy in the photos she posted on an Internet website (Compl. ¶ 51). The Four Navy SEAL plaintiffs allege that AP violated California's Constitution (second cause of action) and common law (fourth cause of action) by disclosing the photographs without obscuring their "faces" or "identifying characteristics," which they allege were private and "not a legitimate public concern." (Compl. ¶¶ 46, 62.) Jane Doe contends in the third cause of action that AP reporter Hettena intruded on her privacy in violation of California common law by inspecting and copying photographs "he knew did not belong to him," and which the operator of the website she used allegedly "forbade him from downloading." (Compl. ¶ 52.) Based on these state law causes of action, all defendants seek an injunction against further dissemination of the photos, compensatory and punitive damages, and other relief.

In reviewing plaintiffs' privacy claims, four facts before the Court warrant highlighting:

1. The photographs at issue were already freely available to public when they were discovered on the Internet by Hettena. (Hettena Dec. ¶¶ 10-11.) While searching the Internet Hettena innocently came across the photos appearing to show Iraqi prisoners in U.S. custody, a fact Hettena confirmed before writing his first news report.

///

///

///

2. The website where the photos were posted looked just like any other publicly available website and imposed no restriction on public access to the photos. (Hettena Dec. ¶¶ 12-18; Ex. D.) The photos could be found through a simple Google search, and required no password to view or copy.

3. The Navy never asked AP not to publish photos from the website, either before publication or since. (Hettena Dec. ¶ 30.) The Navy has never suggested to the AP that it violated any law by publishing its news report about the photographs.

4. The AP considered the existence of the photos and their posting on the Internet to be highly newsworthy. (Hettena Dec. ¶ 15.) The issue of possible abuse by U.S. troops has been the subject of several high-level investigations by the federal government[5] and has been debated in Congress;[6] nine SEALS are being prosecuted in San Diego for prisoner abuse and for taking photos of prisoners; and the Navy promptly launched its own investigation after learning of the photographs at issue. The significant news value of AP's report – confirmed by the independent decisions of editors all across the country – is beyond dispute.

On the facts alleged, and on the record now before the Court, plaintiffs have no possible grounds to demand damages or other relief from AP based upon its truthful reporting of a newsworthy event. The Complaint should promptly be dismissed, as will now be demonstrated.

///

///

---

[5] The Pentagon itself has conducted at least four investigations: by Navy Inspector General Vice Adm. Albert Church, by Army Brig. General John Furlow, by Lt. Gen. James Helmly and by Army Brig. Gen. Richard Formica. *See*, *The Probes*, Miami Herald, Jan. 15, 2005 at A3. *See also*, Robert Burns, *Confidential report alerted some U.S. Commanders in Iraq to abuse*, Assoc. Press, Dec. 1, 2004; D. Jehl and E. Schmitt, *Army's Report Faults General in Prison Abuse*, N.Y. Times, Aug. 27, 2004 at A1. Eric Schmitt, *4 Navy Commandos Are Charged in Abuse*, NY Times, Sep. 4, 2004 at 6; Josh White, *3 More Navy SEALS Face Abuse Charges*, Wash. Post, Sep. 25, 2004 at 16.

[6] *E.g.*, 151 Cong. Rec. S3009 (daily ed. Nov. 17, 2005) (statement of Sen. Kennedy) (citing "grave breaches" of the Geneva Convention); *id.* at S3007 (statement of Sen. Leahy) (describing "deeply troubling" allegations of prisoner abuse).

## ARGUMENT

## I.

## PLAINTIFFS HAVE NO CLAIM FOR INVASION OF PRIVACY

Plaintiffs' privacy claims fail both because the facts alleged do not establish the necessary elements of any privacy cause of action, and because the First Amendment prohibits state law from punishing the publication of truthful newsworthy information. As California courts have long recognized, "the right of privacy 'does not exist in the dissemination of news and news events.'" *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 208 (1998) (*quoting Melvin v. Reid*, 112 Cal. App. 285, 290 (1931)).

### A. The Complaint States No Claim For Disclosure of Private Facts

Plaintiffs Four Navy SEALS allege that defendants invaded their privacy by publicly disclosing private facts about them, specifically by disclosing their "identities and identifying characteristics" (Compl. ¶ 59) and "their service as covert operatives" (Compl. ¶ 45). To establish this claim plaintiff must prove (1) public disclosure; (2) of a private fact; (3) which would be offensive to the reasonable person; and (4) which is not of legitimate public concern. *Shulman*, 18 Cal. 4th at 214. Whether viewed as a common law tort, or a violation of the California Constitution, each of these elements is a fundamental prerequisite to any cause of action for the public disclosure of a private fact. *See Shulman*, 18 Cal. 4th at 227 (California Constitution draws upon common law meaning of the term "privacy"). Apart from the existence of a "public disclosure" by AP, plaintiffs cannot establish any of the elements of this tort.

1. No Private Fact. The AP news report did not contain any facts about the Navy SEAL plaintiffs that can properly be deemed "private," because the photographs disseminated by AP had already been made public by their posting on the Internet. There can simply be no privacy with respect to a matter which is already in the public domain. *Sipple v. Chronicle Publ'g Co.*, 154 Cal. App. 3d 1040, 1047 (1984); *Melvin*, 112 Cal. App. at 290; *Johnson v. Harcourt, Brace, Jovanovich, Inc.*, 43 Cal. App. 3d 880, 891-93 (1974). *Accord Brewer v.*

///

*Hustler Magazine, Inc.*, 749 F.2d 527, 529-30 (9th Cir. 1984) (publication of photograph is not actionable when photograph has already been published).

Moreover, the gravamen of a claim for public disclosure of private facts is the "unwarranted publication of intimate details of plaintiff's private life." *Porten v. Univ. of San Francisco*, 64 Cal. App. 3d 825, 828 (1976). To be actionable, "the facts disclosed must be *private facts*, and not public ones." *Forsher v. Bugliosi*, 26 Cal. 3d 792, 808 (1980) (emphasis in original). Photographs depicting conduct by United States soldiers while on active duty do not disclose private facts in any meaningful sense. The acts depicted were done in front of other soldiers and Iraqi prisoners, and involved no intimate details of the type protected by this tort. *Restatement (Second) of Torts* § 652D, cmt. b (the privacy tort "applies only to publicity given to matters concerning the private, as distinguished from the public, life of the individual"); *Sipple*, 154 Cal. App. 3d at 1047 (tort protects "intimate details of one's private life"). It would pervert the purpose of the privacy tort if it could be used by members of the military to keep facts about their performance of official duties from public scrutiny, particularly in the absence of any claim of confidentiality by military officials.

2. <u>No "Offensive" Conduct</u>. Plaintiffs cannot demonstrate that it was "offensive" for AP to disseminate the photographs it did, as examples of the scores of photos on the Internet. The photos were published exactly as they appeared on the Internet, and were directly tied to the news story, conveying to the public the nature of the conduct being investigated by the Navy. Publishing the identities of individuals who are a part of newsworthy events is not outrageous, as a matter of law, even where the public exposure may create risks for those who otherwise operate covertly. *See, e.g., Ross v. Burns*, 612 F.2d 271, 271-72 (6th Cir. 1980) (publishing photographs of undercover narcotics officer not actionable even where publication "increased his risk of recognition in the community and thereby jeopardized his personal safety and efficacy on the job"); *Price v. Viking Press, Inc.*, 625 F. Supp. 641, 643, 650 (D. Minn. 1985), *aff'd*, 881 F.2d 1426 (8th Cir. 1989) (identifying an FBI

///

///

agent in book accusing him of complicity in murder not actionable despite claim that disclosure "encourage[d] violent individuals to consider physically harming him or his family").

3. The Photographs Were Newsworthy. Plaintiffs cannot possibly establish, as they must, that the photographs were not newsworthy. A "lack of newsworthiness is an element of the 'private facts' tort," making newsworthiness a complete bar to common law liability *Shulman*, 18 Cal. 4th at 215. Whether published material is newsworthy is a threshold issue of law for the court, which must "assess[] the logical relationship or nexus, or lack thereof, between the events or activities that brought the person into the public eye and the particular facts disclosed." *Id.* at 224. (*citing Restatement (Second) of Torts* § 652D, cmt. h). *See Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 895 (9th Cir. 1988) (affirming Rule 12(b)(6) dismissal of publication of private fact claim); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123-25 (N.D. Cal. 2002) (dismissing publication of private facts claim on Rule 12(b)(6) motion). In making this assessment, the court must grant "considerable deference to reporters and editors" in order to avoid "unconstitutional interference." *Shulman*, 18 Cal. 4th at 224-25.

In this case, there can be no serious dispute about the newsworthiness of the photographs. The public interest is inherent in the fact that the photos depict conduct by armed forces acting in the name of the United States, and is confirmed by the Navy's immediate decision to investigate the photos and the independent editorial judgment of editors across the country, who published the AP report. The sample photographs published by AP were "substantially relevant to the newsworthy subject matter of the [AP news report] and did not constitute 'a morbid and sensational prying into private lives for *its own sake*.'" *Shulman*, 18 Cal. 4th at 229 (emphasis in original) (citation omitted).

Plaintiffs do not seriously contend otherwise, but suggest AP could have edited the photos to mask the SEALS' identities, which they argue "added nothing to [the] public discourse." (Compl. ¶ 41.) Plaintiffs' contention is wrong, in fact and law. As a factual matter, the facial expressions of the SEALS in many instances are a central part of the photo's news value. The images would not convey the same meaning or the same impact if the faces

of the SEALS were obscured. See Hettena Decl. ¶ 28; Ex. A. As a matter of law, the claim that AP "could have told the same story" with plaintiffs' images obscured is not the measure of newsworthiness. As the California Supreme Court has recognized:

> That the broadcast *could* have been edited to exclude some of [plaintiff's] words and images and still excite a minimum degree of viewer interest is not determinative. Nor is the possibility that the members of this or another court, or a jury, might find a differently edited broadcast more to their taste or even more interesting. The courts do not, and constitutionally could not, sit as superior editors of the press.

*Shulman*, 18 Cal. 4th at 229; *see also Wilkins v. National Broadcasting Co.*, 71 Cal. App. 4th 1066, 1085 (1999) (same). Plaintiffs' "proposed rule – that a published report of embarrassing but newsworthy private facts is actionable unless the reporter omits the name of its subject – would overhaul journalism as we know it. . . . This would change the tone of stories about matters of the greatest public concern, many of which are stories about individuals of no renown." *Pasadena Star-News v. Superior Court*, 203 Cal. App. 3d 131 (1988). To the contrary, because the SEALS' identities were "substantially relevant to the newsworthy subject matter," no privacy claim exists. *Shulman*, 18 Cal. 4th at 229.

4. <u>AP's News Report Is Constitutionally Privileged</u>. This bar against privacy claims challenging truthful publication about matters of public significance is dictated not only by the law of California, but also by the First Amendment. "[W]here discussion of public affairs is concerned," the Supreme Court has instructed, "[t]ruth may not be the subject of either civil or criminal sanctions," because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964); *see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986) ("speech of public concern is at the core of the First Amendment's protections"). Thus, the "freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940).

///

///

In *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979), the Supreme Court specifically held that "truthful information about a matter of public significance" receives the full protection of the First Amendment, as has the California Supreme Court. *Gates v. Discovery Communications, Inc.*, 34 Cal. 4th 679 (2004). This principle applies even when a publication discloses intimate facts. *See Shulman*, 18 Cal. 4th at 216 ("newsworthiness" requirement "provides a constitutional defense...against liability for publication of truthful information"); *Maheu v. CBS Inc.*, 201 Cal. App. 3d 662, 674-75 (1988) (same); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) (no actionable invasion of privacy for disclosing name of rape victim and circumstances of her death, because report addressed a newsworthy matter of public concern); *Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) (sexual assault victim has no claim for violation of state law where publication of name was newsworthy).

Because plaintiffs do not challenge the truth of the AP report, and given its obvious public significance, plaintiffs have not, and cannot, state a cause of action for public disclosure of private facts, under either the common law or the Constitution of the State of California.

**B. <u>The Complaint States No Claim for Intrusion Upon Seclusion</u>**

Jane Doe separately asserts that defendants invaded her privacy by intruding upon a private place to download, and copy the photographs. (Compl. ¶ 52.) The tort of intrusion upon seclusion creates a remedy for conduct that amounts to: "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Shulman*, 18 Cal. 4th at 230-31 (*citing, inter alia, Restatement (Second) of Torts* § 652B). The tort "encompasses unconsented-to physical intrusion into . . . place[s] the privacy of which is legally recognized, as well as unwarranted sensory intrusions, such as eavesdropping, wiretapping, and visual or photographic spying." *Id.* Both the issue of whether there has been an intrusion and the determination of whether conduct is sufficiently offensive to support a cause of action initially must be made by the court as a matter of law. *Salazar v. Golden State Warriors*, 2000 WL 246586, at * 1-4 (N.D. Cal. Feb. 29, 2000) (dismissing intrusion claim on Rule 12(b)(6) motion); *see Marich v. MGM/UA Telecommunications, Inc.*, 113 Cal. App. 4th

415, 432 (2003); *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 819-20 (9th Cir. 2002). Here, Jane Doe's privacy claim is patently defective because the facts alleged do not amount to an intrusion on a private place and do not depict "highly offensive" behavior.

1. No Intrusion Occurred. Plaintiff Jane Doe contends that an intrusion occurred because she had an "objectively reasonable expectation of privacy that her private photographs would not be stolen." (Compl. ¶ 51.) One cannot have an objectively reasonable expectation of privacy, however, in photographs posted on a public Internet website, particularly one that is indexed to the Google search engine and can be accessed with no password. It is "obvious that a claim to privacy is unavailable to someone who places information on an indisputably, public medium, such as the Internet, without taking any measures to protect the information." *United States v. Gines-Perez*, 214 F. Supp. 2d 205, 225 (D.P.R. 2002), *remanded on other grounds*, 90 Fed. Appx. 3, 2004 WL 528426 (1st Cir. Mar. 18, 2004). *See also Konop v. Hawaiian Airlines, Inc.*, 236 F.3d 1035, 1045 (9th Cir. 2001) (no reasonable expectation of privacy in electronic communications through facilities readily available to public), *superseded on other grounds*, 302 F.3d 868 (9th Cir. 2002); *U.S. v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (no reasonable expectation of privacy in transmissions over Internet); *J.S. ex rel. H.S. v. Bethlehem Sch. Dist.*, 757 A.2d 412, 425 (Pa. Commw. 2000) (no expectation of privacy in website not protected by password because "any user who happened upon the correct search terms could have stumbled upon [plaintiff's] web-site").

This conclusion is particularly compelling here because the smugmug.com website makes available a number of security options, none of which were initiated by Jane Doe: Photos posted with smugmug.com can be password protected; they can be restricted to prevent downloading by those who view them; and, they can be restricted so that copies will not be sold through the mail. (Schulz Dec. ¶ 6 and Ex E.) Smugmug.com also allows its users to shield their photos, so they will not be visible to Google and will not be found through a Google search (*Id.*) None of these protections were applied by Jane Doe, who made her photos searchable on Google and available for inspection, copying and purchase to anyone, anywhere in the world.

Whether Jane Doe actually understood that she was posting the photos on the World Wide Web, she could have no *objectively* reasonable expectation that photos posted on the public Internet were private. *See Shulman v. Group W. Prod., Inc.*, 59 Cal. Rptr. 2d 434, 446-47 (1997), *aff'd in relevant part*, 18 Cal. 4th 200 (1998) (an "objectively reasonable" expectation of privacy "looks to all the surrounding circumstances and views them in light of any competing social interests). *Cf. In re Christian S.*, 7 Cal. 4th 768, 778 (1994) (reaffirming that a party's actual belief in a fact does not make that belief reasonable.).

Nor is plaintiff aided by advancing the incendiary conclusion that the photographs were "stolen" (Compl. ¶ 51), when the photos were publicly available on a site where visitors were welcome to copy them.[7] Moreover, the smugmug "User Agreement" did not forbid Hettena from downloading the photographs, as Jane Doe alleges. All apart from the fact that Hettena was never asked to agree to any restrictions before viewing and copying any photographs (Hettena Dec. 13, 15, 18), and overlooking that *any* contractual violation would be an issue between Hettena and the site operator, the relevant Terms of Use on the website provide only that its subscribers (like Jane Doe) retain the copyrights in their own photos, and that users (like Hettena) do not have permission to make any commercial use of them, which was not done here.[8] *See* Schulz Decl., Ex. D.

2. <u>No "Highly Offensive" Conduct</u>. Even had an intrusion occurred, the law recognizes that some intrusions are warranted by other social interests, and limits tort claims to "highly offensive" conduct. *Shulman*, 18 Cal. 4th at 236-37. Whether conduct is highly offensive turns on all of the circumstances, "including its degree and setting and the intruder's 'motives and objectives.'" *Id.* (citations omitted).

///

---

[7] In this sense, posting on the Internet without restricting public access is no different than if she had placed a photo album on a library shelf, indexed it in the card catalog, and then complained when someone viewed or copied a page. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997) ("The Web is thus comparable, from the readers' viewpoint, to . . . a vast library including millions of readily available and indexed publications.").

[8] The terms of use also bar copying "the site" without permission of smugmug.com, but expressly authorizes caching (copying) particular pages of the site. (Schulz Decl. Ex. D at 2.)

The question of a defendant's *purpose* in undertaking the challenged activity disposes of the "offensiveness" inquiry, when the defendants are journalists whose "motive [is] to discover socially important information." *Shulman*, 18 Cal. 4th at 239, 74 Cal. Rptr. 2d at 869. As the California Supreme Court instructs:

> [T]he constitutional protection of the press . . . reflect[s] the strong societal interest in effective and complete reporting of events, an interest that may – as a matter of tort law – justify an intrusion that would otherwise be considered offensive. . . . In deciding, therefore, whether a reporter's alleged intrusion into private matters (*i.e.*, physical space, conversation or data) is "offensive" and hence actionable as an invasion of privacy, courts must consider the extent to which the intrusion was, under the circumstances, justified by the legitimate motive of gathering the news.

*Id.* at 236-37. *See also, Sanders v. Am. Broad. Cos.*, 20 Cal. 4th 907, 911, 919 (1999) (offensiveness element may be negated by motive to gather news); *Med. Lab. Mgmt. Consultants*, 306 F.3d at 819 (same).

Here, there is no allegation that Hettena's inspection of the photos was for any purpose other than reporting the news, nor could there be. (Hettena Dec. ¶ 10.) Because AP's motive was solely to gather and report the news, its conduct – otherwise legal in every respect – may not be labeled "highly offensive" as a matter of law. The conclusion is only reinforced by the facts that AP's techniques in finding the photo involved only routine newsgathering tools available to the general public (a Google search), AP knew of no law prohibiting publication of the photos, and many photos of Navy SEALS are otherwise widely available on the Internet. *See, e.g.*, Schulz Decl. ¶¶ 2-4, Exs. A-C.

Defendants' conduct is not the kind the intrusion tort was designed to deter and the claim should be dismissed. As in *Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509, 516, 520 (1986), plaintiffs "simply state[ ] that the media defendants sought out the newsworthy information which they subsequently published," and this type of activity is "protected by the First Amendment."

///

///

## II.

## PLAINTIFFS' CLAIMS FOR INVASION OF PRIVACY SHOULD BE STRICKEN PURSUANT TO THE CALIFORNIA "ANTI-SLAPP" STATUTE IN ANY EVENT

All apart from their failure to state any claim for invasion of privacy, plaintiffs' state law causes of action should be stricken pursuant to California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, because plaintiffs' cannot possibly demonstrate a *probability* of succeeding, even if their Complaint states a claim.

The California Legislature enacted Cal. Code Civ. Proc. § 425.16(a), to "nip SLAPP litigation in the bud," *Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997), and to promote the "'fast and inexpensive unmasking and dismissal'" of lawsuits that implicate the constitutional right of freedom of speech. *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1109 (N.D. Cal. 1999) (citation omitted). The purpose of the statute is to "allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).

Under the anti-SLAPP statute, any "cause of action . . . arising from any act of [the defendant] in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1). This statute broadly applies to "*any* written . . . statement or writing" on a public issue, and to "*any other conduct* in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." *Id.*, §§ 425.16(e)(2), 425.16(e)(4) (emphasis added).

It is well settled that the anti-SLAPP statute specifically applies to claims asserted against reporters and news organizations for reporting the news on public issues. *See, e.g.*, *Metabolife Int'l, Inc.*, 264 F.3d at 837-39; *Thomas v. Los Angeles Times Communications, LLC*, 189 F. Supp. 2d 1005, 1009-10 (C.D. Cal.), *aff'd*, 45 Fed. Appx. 801 (9th Cir. 2002); *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 14-17, (1995). Indeed, the Legislature recently amended the statute to confirm that it governs not only claims against the press based on

publication of the news, but also claims based on actions by journalists "while engaged in the gathering, receiving, or processing of information for communication to the public." *See* Cal. Code Civ. Proc. § 425.17(d)(1). This comprehensive language reaches "all kinds of claims" relating to speech about public issues. *E.g., Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 744-45 (2003). It is "the *principal thrust or gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies," *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188, 193 (2003) (emphasis in original; citation omitted),[9] and the statute has repeatedly been applied to strike the very sort of privacy claims lodged here against AP. *See, e.g., Matson v. Dvorak*, 40 Cal. App. 4th 539, 550 (1995) (striking claim for invasion of privacy by publication of private facts); *Marich*, 113 Cal. App. 4th at 419 (invasion of privacy governed by anti-SLAPP statute).

It is equally settled that the statute furthers "substantive state interests" and therefore applies when California state law causes of action are asserted in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971-73 (9th Cir. 1999); *see also Thomas v. Fry's Electronics, Inc.*, -- F.3d --, 2005 WL 589586, at *1 (9th Cir. Mar. 15, 2005) (reaffirming that "California anti-SLAPP motions to strike and entitlement to fees and costs are available to litigants proceeding in federal court"). The anti-SLAPP law is implicated regardless of whether jurisdiction is based on diversity or a federal question. *See, e.g., Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) (diversity action); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1099-1100 (C.D. Cal. 2004) (federal question); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F. Supp. 2d 1127, 1129-30 (N.D. Cal. 1999) (federal question).

As is plain from the Complaint, all of defendants' acts at issue were undertaken in furtherance of their exercise of their free speech rights – specifically, the investigation,

---

[9] *See also Navellier v. Sletten*, 29 Cal. 4th 82, 92 (2002) ("anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability") (emphasis in original); *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 60 (2002) ("'the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights'") (citation omitted).

preparation and dissemination of a news report about a matter of obvious public concern. *See, e.g., Metabolife Int'l, Inc.*, 264 F.3d at 840 (news reports concerning the safety of herbal supplement are a matter of public concern); *Sipple v. Foundation for National Progress*, 71 Cal. App. 4th 226, 239-40 (1999) (news report alleging domestic violence against political consultant is public issue). Plaintiffs' claims fall squarely within the scope of Section 425.16, and to overcome this motion they must therefore come forward with *admissible* evidence establishing a *probability* that they will prevail on the merits of each claim. *See Metabolife Int'l, Inc.*, 264 F.3d at 840; *Nicosia*, 72 F. Supp. 2d at 1110.

In this respect, a special motion to strike is markedly different from a motion to dismiss – to satisfy their burden under the anti-SLAPP statute, "it is not sufficient that plaintiff's complaint survive a demurrer." *DuPont Merck Pharm. Co. v. Superior Court*, 78 Cal. App. 4th 562, 568 (2000). On a special motion to strike, plaintiffs "cannot simply rely on the allegations in [their] pleadings . . . to make the evidentiary showing," nor may the Court simply accept those allegations without proof. *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 656 (1996); *Nicosia*, 72 F. Supp. 2d at 1110 ("[p]leadings by themselves are inadequate to demonstrate a prima facie case"). Instead, plaintiffs must "substantiate the legal sufficiency" of their claims. *DuPont Merck Pharm. Co.*, 78 Cal. App. 4th at 568. To defeat this motion, they must present admissible evidence showing that they will "*probably* prevail" on each of the privacy claims alleged. *Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 953 (1996) (emphasis in original); *see also, e.g., Thomas v. Los Angeles Times*, 189 F. Supp. 2d at 1010.

For the reasons set forth above, and as demonstrated in the accompanying declarations, plaintiffs cannot possibly carry their burden with respect to the privacy claims advanced here. For this reason, too, the claims for invasion of privacy should be stricken at the outset.

## III.

## <u>PLAINTIFFS HAVE NO CLAIM FOR COPYRIGHT INFRINGEMENT</u>

Plaintiffs' afterthought claim for copyright infringement similarly warrants dismissal. Plaintiffs purport to assert infringement of the copyright in "at least one" unidentified

photograph (Compl. ¶ 40) from among "nearly 1800 stored personal photographs" (Compl. Intro.) that previously were published on an Internet web site operated at www.smugmug.com. (Compl. ¶ 15, 17.) This claim is completely defective: It fails to satisfy even the lenient pleading requirements of Fed. R. Civ. P. 8 ("Rule 8"), and AP's publication in any event was a noninfringing fair use, as a matter of law.

## A. <u>The Copyright Claim Is Insufficient Under Fed. R. Civ. P. 8</u>

The copyright claim advanced by plaintiffs does not satisfy even the broad pleading standards of Rule 8. "To state a claim for copyright infringement under [Rule 8], the Complaint must state 'which *specific* original work is the subject of the copyright claim . . . .'" *Flynn v. Health Advocate, Inc.*, 2004 WL 51929 at *12 (E.D. Pa. Jan. 13, 2004) (emphasis in original), *quoting Gee v. CBS, Inc.*, 471 F. Supp. 600, 643 (E.D. Pa.), *aff'd* 612 F.2d 572 (3d Cir. 1979); *see, e.g., BESPAQ Corp. v. Haoshen Trading Co.*, 2005 WL 14841 at *2 (N.D. Cal. Jan. 3, 2005) (allegations insufficient "when plaintiff does not clearly identify the preexisting work"); *Brown v. Adidas Int'l*, 938 F. Supp. 628, 636 (S.D. Cal. 1996) (granting dismissal where plaintiff "does not allege what property Adidas appropriated"). Plaintiffs utterly fail to do so.

The Complaint fails to identify anywhere the specific work plaintiffs claim to have been infringed. Plaintiffs allege only generally that the photographs published by AP were excerpted from a collection of photographs amounting to "nearly 1800 in total." (Compl. ¶ 17.) Of these 1800 photographs, plaintiffs assert that some unspecified number "were taken by NAVY SEAL ONE" (Compl ¶ 38), and that only "certain" of the photographs taken by NAVY SEAL ONE contain material that "is copyrightable subject matter under the laws of the United States." (Compl. ¶ 38.) From this unknown universe of allegedly copyrightable photographs, plaintiffs allege that NAVY SEAL ONE has registered the copyright for five unidentified photographs (Compl. ¶ 38), of which "at least one" unidentified photograph "was used by the AP." (Compl. ¶ 40.) This claim fails to describe the allegedly infringed work and fails to meet even the liberal pleading standards of Rule 8.

/ / /

As one court explained, "merely alleging that Plaintiffs own certain copyrights and that Defendants have infringed on those copyrights in their written materials is insufficient to meet the Rule 8 requirement of pleading in the Complaint the 'specific' original work that is subject of the Copyright claim." *Flynn*, 2004 WL 51929 at *12. As in *Flynn*, plaintiffs' claim that defendants "published a number of the photographs," without identifying which ones, fails to satisfy Rule 8.

**B. <u>AP's Report Was a Non-Infringing Fair Use of Any Copyrighted Photograph</u>**

Even if plaintiffs could cure their pleading deficiencies, the copyright claim still should be dismissed under Fed. R. Civ. P. 12(b)(6) because AP's report made fair use of the photographs at issue and the plaintiffs can prove no set of facts that would entitle them to relief. *E.g., Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993). Here, assuming the truth of the allegations of the Complaint, plaintiffs would not be entitled to relief because AP's use of whatever photographs are at issue was necessarily a fair use.

The Copyright Act expressly provides that, notwithstanding any other provisions of the statute, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, [or] news reporting, . . . is *not* an infringement of copyright." 17 U.S.C. § 107 (emphasis added). The doctrine of "fair use," codified at 17 U.S.C. § 107, is a "means of balancing the need to provide individuals with sufficient incentives to create public works with the public's interest in the dissemination of information." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986). AP's news report is precisely the type of use protected and promoted by the doctrine of fair use. The facts alleged by plaintiffs demonstrate that AP made a transformative use of the photographs to report news of significant public interest, a use that was a noninfringing fair use as a matter of law.

Although fair use generally is a mixed question of fact and law, "'if, even after resolving all issues in favor of the nonmoving party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work.'" *Lamb v. Starks*, 949 F. Supp. 753, 756 (N.D. Cal. 1996), *quoting Hustler Magazine, Inc.*, 796 F.2d at 1151; *see, e.g., Kulik Photography v.*

*Cochran*, 975 F. Supp. 812, 814 (E.D. Va. 1997) (granting motion to dismiss on ground that contested use "was a legal and proper 'fair use.'"). That "fair use" is the only possible conclusion here is readily apparent from an application of the statutory factors governing the fair use determination: (i) the purpose of the use; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used; and (iv) the effect of the use on the market for the original. 17 U.S.C. §107.

**1. Purpose of the Use**

The first factor in the fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The focus of this factor is "whether the new work merely 'supersedes the objects of the original creation or instead adds something new." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (citations omitted). "The more 'transformative' the new work, the less the significance of factors that weigh against fair use, such as use of a commercial nature." *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000).

The Complaint demonstrates that defendants made a transformative use of the photographs for news reporting purposes. As described in the Complaint, the photographs at issue "showed Navy SEALS in the course of their duties in Iraq" (Compl. Intro.), and depicted their interactions with Iraqi "insurgents and terrorists." (Compl. ¶ 29.) The photographs were published "in virtually every major American newspaper, as well as print and broadcast news sources" with an AP news report "regarding alleged Iraqi prisoner abuse." (Compl. ¶ 9.) The AP report "states that the military has launched a criminal investigation into photographs that appear to show Navy SEALS in Iraq." (Compl. ¶ 10.) Thus, as described in the Complaint, the photographs did not merely illustrate a story, but were themselves news; the photographs were the subject of the news report with which they were published.

AP's use not only was for the statutorily favored purpose of news reporting, but was transformative, thus mandating that the first factor weigh in favor of fair use. As in *Nunez v. Carribean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000), "the pictures were the story," and "[i]t would have been much more difficult to explain the controversy without reproducing the

photographs." In that case, the controversy involved photographs of a model that were used in a news story. As the First Circuit explained in finding this use proper:

> [B]y using the photographs in conjunction with editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or message." It is this transformation of the works into news – and not the mere newsworthiness of the works themselves – that weighs in favor of fair use under the first factor of § 107.

*Id.* at 23 (citations omitted); *see Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) ("By putting a copy of the photograph in the newspaper, the work was transformed into news, creating a new meaning or purpose for the work.").

Likewise, AP's report transformed the photographs with new meaning and purpose as news of importance to the public, and the first factor weights heavily in favor of fair use.

**2. Nature of the Original Work**

The second factor requires examination of two issues: whether the original work was published, and whether it is informational in nature. Both of these issues support fair use on the facts alleged.

Works that previously have been published are more susceptible to fair use than unpublished works. *Kelly*, 336 F.3d at 820. Courts have made clear that when a work has been made available via the Internet, it has been "published" within the meaning of the Copyright Act.[10] Material posted on a website is published the moment it "first became accessible on the Internet." *Getaped.Com, Inc.*, 188 F. Supp at 401; *See Kelly*, 336 F.3d at 820 (publication found when "images appeared on the internet before Arriba used them"). Here, the complaint makes clear that plaintiffs made their photographs accessible on the Internet and thus "published" them within the meaning of the Copyright Act. (Compl. ¶¶ 15, 16, 19.)

---

[10] Publication' under the Copyright Act is defined as 'the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending,' or the 'offering to distribute copies . . . to a group of persons for purposes of further distribution . . . or public display.'" *Getaped.Com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 401 (S.D.N.Y. 2002) (alterations in original).

In addition to assessing whether a work was published, the second fair use factor takes into account "that creative works are 'closer to the core of intended copyright protection' than informational and functional works." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (citation omitted). Here, the informational and non-creative nature of the photographs reproduced by AP also weighs in favor of fair use. The existence of the photos was itself newsworthy and AP's dissemination was purely for informational purposes. In an analogous context, addressing a videotape of the beating of Reginald Denny during riots in Los Angeles, the Ninth Circuit concluded that: '"The Denny beating tape is informational and factual and news; each characteristic strongly favors [the user] . . . . Although the Videotape is not without creative aspect in that it is the result of [Marika] Tur's skills with a camera, still this factor makes it a great deal easier to find fair use.'" *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 940 (9th Cir.) (brackets in original; citations omitted), *modified on other grounds*, 313 F.3d 1093 (9th Cir. 2002). *See also, Nunez*, 235 F.3d at 23 ("photographs [at issue] were not artistic representations designed primarily to express Nunez's ideas, emotions or feelings"). Likewise here, plaintiffs' snapshots of Navy SEALS interacting with Iraqi prisoners are not primarily creative or artistic, but factual in nature.

Both inquiries under the second statutory factor militate in favor of fair use.

**3. The Amount Taken**

'"The third factor in the fair use analysis asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the purpose of copying.'" *Mattel, Inc.*, 353 F. 3d at 803 (citations omitted). This factor also weighs in favor of fair use. The photographs reproduced by AP were excerpted from a collection of nearly 1800 photographs published together by plaintiffs in a photo album on smugmug.com. (Compl. Intro.; ¶ 17.) AP's use represents a tiny fraction of the total work, even if plaintiffs' collection is broken into subsets of photographs rather than viewed as the entire 1800-photo collection that was published. For example, the Complaint asserts that "[m]any of the photographs" in plaintiffs' large collection "were taken by NAVY SEAL ONE." (Compl. ¶ 38 (emphasis added)). The alleged publication by AP of "[a]t least one" of

these photographs constitutes use of just a small portion of the photographs taken by NAVY SEAL ONE. *See, e.g.*, *Mathieson v. Associated Press*, 23 U.S.P.Q. 2d 1685, 1690, 1992 WL 164447 (S.D.N.Y. June 24, 1992) ("that eighteen other photos from the brochure were not depicted lessens the amount of defendant's copying, for the two photos are part of a larger compilation of photos which constitutes a single 'work'").

Even if each individual photograph were considered to be a separate work, the third factor would still weigh in favor of fair use. The Ninth Circuit has instructed "that entire verbatim reproductions are justifiable where the purpose of the work differs from the original." *Mattel Inc.*, 353 F.3d at 804 n.8; *see, e.g., Kelly*, 336 F.3d at 821 ("[A]lthough Arriba did copy each of Kelly's images as a whole, it was reasonable to do so in light of Arriba's use of the images"). Unlike other copyrightable works, photographs do not easily lend themselves to quotation or other means of being excerpted without destroying the integrity of the original image, thus courts routinely find use of photographs in their entirety to be appropriate under the third fair use factor. *See, e.g., Kelly*, 336 F.3d at 821 (it was necessary to copy "the entire image to allow users to recognize the image"); *Nunez*, 235 F.3d at 24 ("El Vocero admittedly copied the entire picture; however, to copy any less than that would have made the picture useless to the story"); *Mathieson*, 23 U.S.P.Q. 2d at 1690, 1992 WL 164447 (where "full reproduction of a copyrighted work [was] in the context of news reporting," the third factor weighs in favor of fair use even considering that "each of the photos on the cover constitutes a single work").

**4. Effect on the Market**

The fourth factor in the fair use analysis concerns the effect of the challenged use upon the market for or value of the copyrighted work. 17 U.S.C. § 107(4). The Supreme Court has made clear that in applying the fourth factor there can be "[n]o 'presumption' or inference of market harm" unless the use at issue is nontransformative and a "mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591. Not only can harm not be presumed, "[t]he existence of [a] potential market cannot be presumed either. *Mattel Inc.*, 353 F.3d at 805. Thus, a plaintiff must demonstrate an actual market for their work. For instance, in a

case addressing the claimed fair use of a movie trailer where the plaintiff had "not marketed the movie or the derivative trailer since 1985, and plaintiff ha[d] not set forth any concrete plans to remarket them in the future," the fourth factor was weighed in favor of fair use. *Lamb*, 949 F. Supp. at 757. *See also, Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 n.6 (2d Cir. 1998) (copyright holder failed to identify any market harmed by defendant use).

Here, the Complaint not only fails to allege the existence of any markets for the photographs at issue, but affirmatively disavows any intention of the plaintiffs to market the photographs. Indeed, the primary thrust of plaintiffs' allegations is that the photographs are private and should not be published at all. (*See, e.g.*, Compl. ¶ 46 (plaintiffs desired "that these photographs would not be published"); 49 ("[c]ontinued publication will cause great and irreparable injury"); 57 (same); 65 (same)). These allegations demonstrate that plaintiffs had and have no intention to market their photographs, and thus there are no actual or potential markets for the photographs that have been impaired by defendants' publication. As the Ninth Circuit observed in another matter, based on the pleaded facts, "[w]e think it safe to assume that [plaintiff] will not enter such a market or license others to do so." *Mattel* Inc., 353 F.3d at 806.

In short, the fourth factor too weighs heavily in favor of fair use, as does each of the fair use factors.

**5. Aggregation of the Factors**

"The more transformative the new work, the less important the other factors, including commercialism, become." *Kelly*, 336 F.3d at 818. Here, each of the statutory factors indicates that defendants' publication was a non-infringing fair use of plaintiffs' photographs. The Complaint also makes clear that defendants' use was for news reporting purposes and was transformative of plaintiffs' work. Because the transformative nature of AP's use is made plain by the Complaint, a finding of fair use should be made even if the Court were to find one of the factors to weigh against fair use, or determine that an insufficient factual record exists at

///

this stage to address one of the factors. Accordingly, plaintiffs' claim for copyright infringement should be dismissed on the basis of the allegations in the Complaint itself.

## CONCLUSION

For each of the foregoing reasons, the Court should dismiss plaintiffs' Complaint in its entirety; enter judgment in favor of defendants and against plaintiffs, and award defendants their costs and attorneys' fees.

DATED: April 8, 2005

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

LUCE, FORWARD, HAMILTON & SCRIPPS, LLP

By: ______________________

Robert G. Steiner
Attorneys for DEFENDANTS
ASSOCIATED PRESS and SETH HETTENA

2056550.1