USDC SCAN INDEX SHEET



TKL 4/25/05 12:48

3:05-CV-00555 FIVE NAVY SEALS V. ASSOCIATED PRESS

*12*

*OPPM.*

Dockets.Justia.com

JAMES W. HUSTON (BAR NO. 115596)
DAVID C. DOYLE (BAR NO. 70690)
KRISTINA M. HOY (BAR NO. 220167)
CHARLES S. EVENDORFF (BAR NO. 187119)
MORRISON & FOERSTER LLP
3811 Valley Centre Drive, Suite 500
San Diego, California 92130-2332
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

FILED
05 APR 21 AM 1:59
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Attorneys for Plaintiffs
FOUR NAVY SEALS AND JANE DOE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FOUR NAVY SEALS AND JANE DOE,

Plaintiffs,

v.

ASSOCIATED PRESS, a New York corporation; SETH HETTENA, an individual; and Does 1 through 50, inclusive,

Defendants.

Case No. 05 CV 0555 JM (JMA)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STRIKE**

Date: May 6, 2005
Time: 11:00 a.m.
Ctrm: 6
Judge: Jeffrey Miller

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. THE COMPLAINT PLEADS THE REQUISITE ELEMENTS OF EACH CLAIM ........ 4

A. Standard for Rule 12(b)(6) and Federal anti-SLAPP Motions ........ 4

B. The Complaint States Claims for Invasion of Privacy ........ 5

1. The Four Navy SEALs Stated a Claim for Disclosure of Private Facts ........ 5

a. Public Disclosure ........ 5

b. The SEALs' Identities are Private Facts ........ 6

c. Revealing the Identities of Navy SEALs, Knowing it will Endanger their Lives, is Patently Offensive Conduct ........ 7

d. Identities are not Per Se Newsworthy ........ 8

e. The AP Has No "Constitutional Privilege" to Invade Privacy ........ 11

C. The California Constitutional Right to Privacy is Distinct from Common Law Invasion of Privacy and the AP Presented no Grounds to Dismiss it ........ 12

D. Jane Doe Stated a Proper Claim for Intrusion ........ 13

1. An Intrusion Occurred ........ 13

2. The AP's Conduct was Highly Offensive ........ 15

III. THE ANTI-SLAPP LAW IS INAPPLICABLE TO THIS CASE BECAUSE IT IS NOT ABOUT CHILLING SPEECH, BUT ABOUT PROTECTING IDENTITIES ........ 17

IV. NAVY SEAL ONE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT ........ 19

A. Neither the Fair Use Defense nor Rule 8 Provide Bases for Dismissal ........ 19

B. The Fair Use Defense does not Protect Defendants' Conduct ........ 20

1. Using a Work for a Commercial Purpose is Presumptively Unfair ........ 21

2. Plaintiff's Original, Creative Work has never been Published ........ 22

3. The AP Used the Entire Copyrighted Work ........ 24

4. The Photographs have Value ........ 24

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page

## CASES

*AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692 (9th Cir. 1999) ... 4

*Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307 (1997) ... 12

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994) ... 20

*Batesville Services, Inc. v. Funeral Depot, Inc.*, 2004 WL 2750253 (S.D.Ind. 2004) ... 22

*Beam Sys., Inc. v. Checkpoint Sys., Inc.*, 1995 U.S. Dist. LEXIS 21495 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)) ... 20

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ... 21, 22, 24

*Capra v. Thoroughbred Racing Assoc.*, 787 F.2d 463 (9th Cir. 1986) ... 9

*Cervantes v. City of San Diego*, 5 F.3d 1273 (9th Cir. 1993) ... 19

*Chicago Board*, 354 F.3d at 934 ... 20, 25

*Chicago Sch. Reform Bd. of Trs. v. Substance, Inc.*, 79 F. Supp. 2d 919 (N.D. Ill. 2000) ... 20, 25

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ... 18

*ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993 (2001) ... 17

*Condit v. National Enquirer*, 248 F. Supp. 2d 945 (E.D. Cal. 2002) ... 17, 18, 19

*Cramer v. Consol. Freightways, Inc.*, 209 F.3d 1122 (9th Cir. 2000) ... 14

*Creative Computing v. Getloaded.com LLC*, 386 F.3d 930 (9th Cir. 2004) ... 14

*Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002) ... 8

## TABLE OF AUTHORITIES
**(continued)**


**Page**

*Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468 (2000) .......... 17

*Diaz v. Oakland Tribune*, 139 Cal. App. 3d 118 (1983) .......... 9

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971) .......... 11, 13

*Egan v. Schmock*, 93 F. Supp. 2d 1090 (N.D. Cal. 2000) .......... 12

*Fraternal Order of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105 (3d Cir. 1987) .......... 14

*Gallimore v. State Farm & Cas. Ins. Co.*, 102 Cal. App. 4th 1388 (2002) .......... 18

*Gates v. Discovery Communications*, 34 Cal. 4th 679 (2004) .......... 11

*Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002) .......... 23

*Grosso v. Miramax Film Corp.*, 400 F.3d 658 (9th Cir. 2005) .......... 4

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .......... 21, 23, 24, 25

*Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal. 4th 1 (199) .......... 12

*Huskey v. Nat'l Broad. Co.*, 632 F. Supp. 1282 (N.D. Ill. 1986) .......... 13

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148 .......... 21

*IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812 (W.D. Wis. 2001) .......... 13

*In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9 (1st Cir. 2003) .......... 14

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) .......... 24

*Int-Elect Eng'g, Inc. v. Clinton Harley Corp.*, 1993 U.S. Dist. LEXIS 11510 (N.D. Cal. June 24, 1993) .......... 20

## TABLE OF AUTHORITIES
**(continued)**


**Page**

*Iowa State Univ. Research Found., Inc. v. ABC, Inc.*, 621 F.2d 57 (2d Cir. NY 1980) ..... 21

*J.P. Turnbull v. ABC*, 2004 U.S. Dist. LEXIS 24351 (C.D. Cal. Aug. 19, 2004) ..... 17

*J.S. ex rel. H.S. v. Bethlehem Sch. Dist.*, 757 A.2d 412 (Pa. 2000) ..... 14

*Kelly*, 336 F. 2d at 820 ..... 22, 23

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ..... 20

*Konop v. Hawaiian Airlines, Inc.*, 236 F.3d 1035 (9th Cir. 2001) ..... 14

*Lamb*, 949 F. Supp. at 757 ..... 21

*Leidholdt v. L.F.P., Inc.*, 860 F.2d 890 (9th Cir. 1988) (affirming 12(b)(6) ..... 8

*Loder v. City of Glendale*, 14 Cal. 4th 849 (1997) ..... 12

*Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149 F.3d 987 (9th Cir. 1998) ..... 15

*MGM Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029 ..... 20

*M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623 (2001) ..... 3, 5, 6, 7, 9, 10, 11, 17, 18

*Marich v. MGM/UA Telecomm., Inc.*, 113 Cal. App. 4th 415 (2003) ..... 13

*Mathieson v. Associated Press*, 1991 U.S. Dist. LEXIS 4982 (S.D.N.Y. April 16, 1991) ..... 20

*Med. Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806 (9th Cir. 2002) ..... 13

*Metabolife Int'l v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ..... 4

*Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463 (1986) ..... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) ........ 22

*Price v. Viking Press, Inc.*,
625 F. Supp. 641 (D. Minn. 1985) ........ 8

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ........ 15

*Rogers v. Home Shopping Network, Inc.*,
57 F. Supp. 2d 973 (C.D. Cal. 1999) ........ 4, 5, 17

*Ross v. Burns*,
612 F.2d 271 (6th Cir. 1980) ........ 8

*Salazar v. Golden State Warriors*,
2000 U.S. Dist. LEXIS 2366 ........ 13

*Salinger v. Random House*,
811 F.2d 90 (2d Cir. NY 1987) ........ 25

*Sanders v. ABC*,
20 Cal. 4th 907 (1999) ........ 13, 14

*Shulman v. Group W Productions, Inc.*,
18 Cal. 4th 200 (1998) ........ 5, 8, 9, 12, 13, 16

*Sipple v. Chronicle Publ'g Co.*,
154 Cal. App. 3d 1040 (1984) ........ 7

*Smith v. Daily Mail Publ"g Co.*,
443 U.S. 97 (1979) ........ 11

*State Farm Gen. Ins. Co. v. Majorino*,
99 Cal. App. 4th 974 (2002) ........ 18

*The T.J. Hooper*,
60 F.2d 737 (2d Cir. 1932) ........ 10

*Times-Mirror Co. v. Superior Court*,
198 Cal. App. 3d 1420 (1988) ........ 3, 7, 8, 9, 10, 11, 18

*U.S. v. Lifshitz*,
369 F.3d 173 (2d Cir. 2004) ........ 14

*United States v. Geibel*,
369 F.3d 682 (2d Cir. 2004) ........ 14

*United States v. Gines-Perez*,

## TABLE OF AUTHORITIES
**(continued)**

**Page**

214 F. Supp. 2d 205 (D.P.R. 2002) ..... 14

*Vassiliades v. Garfinckel's*,
492 A.2d 580 (D.C. 1985) ..... 9

*Verizon Del., Inc. v. Covad Communs. Co.*,
377 F.3d 1081 (9th Cir. 2004) ..... 4

*Vescovo v. New Way Enters., Ltd.*,
60 Cal. App. 3d 582 (1976) ..... 13

*Video Pipeline, Inc. v. Buena Vista Home Ent't, Inc.*,
210 F. Supp. 2d 552 (D.N.J. 2002) ..... 20

*Video Pipeline, Inc. v. Buena Vista Home Ent't, Inc.*,
275 F. Supp. 2d 543 (D.N.J. 2003) ..... 22

*Virgil v. Time, Inc.*,
527 F.2d 1122 (9th Cir. 1975) ..... 9, 11

*Weinberg v. Feisel*,
110 Cal. App. 4th 1122 (2003) ..... 17

*World Wrestling Fed'n Entm't, Inc. v. Bozell*,
142 F. Supp. 2d 514 ..... 20

*Y.G. v. Jewish Hosp. of St. Louis*,
795 S.W.2d 488 (Mo. Ct. App.1990) ..... 9, 13

**STATUTES**

50 U.S.C. § 421 ..... 11

50 U.S.C. Section 421 ..... 16

17 U.S.C. § 101 ..... 23

17 U.S.C. § 102(a)(5) ..... 24

17 U.S.C. § 106 ..... 21

17 U.S.C. § 107 ..... 21, 24, 25

17 U.S.C. § 512 ..... 23

Fed. R. Civ. P. 12(b)(6) ..... 4, 5, 6, 19, 20

# I. INTRODUCTION

The Associated Press and Seth Hettena (collectively, the "AP") filed a Motion to Dismiss and Strike ("Motion") claims that do not exist. The Complaint filed in this action does ***not*** seek to hold the AP liable for publishing photographs that do not show identifying details. It does ***not*** seek to hold the AP liable for printing articles about the photographs. It seeks ***only*** to recover for the AP's printing the images and identifying details of covert operatives in Iraq.

This case is about four Navy SEALs who did nothing wrong, have not been charged with any crime, and risked their own lives using approved procedures to capture wanted terrorists.[1] It is ***not*** about Abu Ghraib.

Although the AP's evidentiary submissions are wholly improper for purposes of deciding its Motion, it is noteworthy that the four "facts"[2] the AP argues "warrant highlighting" are false:

1. The photographs at issue were ***not*** freely available to the public when they were discovered by Mr. Hettena. Instead, they were posted on a password-protected, personal webpage for storage. Declaration of Jane Doe ("Doe Decl.") ¶ 3. Contrary to conclusory representations to the Court, Mr. Hettena has already admitted that he found the photographs on a "***personal***" webpage. *Id.*. Ex. 1. Very few people even knew the photographs were posted, and almost nobody viewed them until they were published to the world by the AP. *Id.* ¶ 3; Declaration of Donald MacAskill ("MacAskill Decl.") ¶ 2. The Four Navy SEALs did ***not*** know their photographs had even been stored on Jane Doe's personal webpage. Doe Decl. ¶ 4.

2. The website where the photos were located ***did*** impose restrictions on public access to the photographs. The smugmug.com Terms of Use prohibit downloading, copying, or

---

[1] The AP's continued attempt to link these four SEALs to alleged abuse, by citing abuse allegations against ***other*** military personnel, has no proper place in this litigation. The AP's own published stories admit that the four SEALs have not been charged with any crimes. The "charge sheet" supposedly prosecuting a SEAL for posing with a prisoner attached as Exhibit C to the Declaration of Seth Hettena ("Hettena Decl.") states clearly the charge related to posing for a photograph in which the prisoner was "subject to degrading treatment." That prisoner was allegedly abused and later died. *See* Hettena Decl. Ex. B. Moreover, the "charge sheet" actually ***blacked out the name of the SEAL charged with the crime***, supporting that the identities of the SEALs are protected. *See* id. at Ex. C.

[2] Def. Mem. pp. 5-6.

commercial use of any portion of the site. Declaration of Kimberley Conklin ("Conklin Decl.") ¶ 15. All users of the site agree to those terms as a condition of access. *Id.* ¶ 15. Likewise, the site states specifically that users retain the copyright to their photographs. *Id.* ¶ 15.

3. The AP's argument that the Navy has not asked it not to publish the photographs is a disingenuous parsing of words. The Navy ***told*** the AP, as set forth in Mr. Hettena's first article, that publishing the photographs "could put [the SEALs] or their families at risk." Conklin Decl. ¶¶ 4, 6. The AP admitted as much when reporting that "[o]ut of safety concerns, [it] is not identifying the woman who posted the photos." Likewise, Jane Doe told Mr. Hettena publishing the photographs could endanger the SEALs. Doe Decl. ¶ 7.

4. The ***identities depicted in the photographs*** of the Four Navy SEALs are not newsworthy, and Plaintiffs are ***not*** suing the AP for publishing an article about the photographs. In fact, the AP itself has reported that the SEALs were "using approved procedures" to capture terrorists. Conklin Decl. ¶ 12. Publishing photographs that could endanger the SEALs, particularly when they have not been charged with a crime, violate ethical journalistic standards. Declaration of Scott McKiernan ("McKiernan Decl.") ¶ 9, 11; Declaration of James Bellows ("Bellows Decl.") ¶ 9, 10. An AP supervising photo editor agrees. Declaration of Paul Harrington ("Harrington Decl.") ¶ 4. Disclosing the identity of covert operatives can be a violation of law, and endangers the safety of the SEALs and their families. Declaration of E. Allan Platt ("Platt Decl"). ¶ 26; Declaration of MacKubin Thomas Owens ("Owens Decl.") ¶ 24.

The consequences of the AP's actions have already been enormous, and are now a matter of life and death for the Plaintiffs. Notwithstanding the fact that these men did nothing wrong, their faces have been plastered all over the world. One website flashes their photographs with the caption "Remember these Faces," and one San Diego website has been hosting both the photographs and an ongoing discussion of *where to find* these "sadists" and "torturers." Conklin Decl. ¶¶ 3-11. Ever since their identities were disclosed, the SEALs and their families have been, and remain, in real danger of being killed.

This result comes from the AP violating the law and commonly accepted standards of journalism. Paul Harrington, an AP photo editor for almost 25 years, explains: "[N]either I nor

any other respectable or ethical journalist would run photographs identifying active duty Navy SEALs, without permission, unless those SEALs were charged with a crime." Harrington Decl. ¶ 4.[3] Two industry experts concur; one with decades of experience running big city newspapers, the other owner of one of the largest independent editorial photo agencies in the world. Bellows Decl. at ¶ 14 and McKiernan Decl. ¶¶ 9, 11.

The AP contends that the Plaintiffs can have no redress for the AP's wrongs because it is shielded by the First Amendment. The AP is wrong. Remarkably, the AP ignored and failed to cite the two California decisions directly on point. In *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623 (2001), the court denied an anti-SLAPP motion brought by the press where the complaint alleged invasion of privacy for publishing faces in a team photograph, which had already been seen by the teams' families and others, where the connection between the individuals in the photograph and the news story could harm them. Likewise, in *Times-Mirror Co. v. Superior Court*, 198 Cal. App. 3d 1420, 1428 (1988), the Court held that "even where particular facts about an individual can be printed the person's identity may be treated separately and not be subject to publication," and found a privacy claim stated by a witness to a murder. The Plaintiffs properly alleged the requisite elements of their privacy claims, have supporting facts to prove each element, and the law provides that they have a right to try this case to a jury.

With respect to Plaintiff's Copyright claim, the AP asserts that its affirmative defense of fair use is a basis for 12(b)(6) dismissal. The AP failed to tell the Court, however, the fair use defense is a fact based inquiry not proper for resolution at the pleadings stage. Moreover, the AP's use of these photographs was not "fair use" and claiming that it was does not shield the AP's surprisingly bold copyright infringement.[4]

---

[3] The SEAL photographs attached to the Declaration of David A. Schulz are completely inapposite—there is a huge difference between publishing willing "recruiting" type photographs with select SEALs and publishing photographs of active duty SEALs involved in covert missions, in Iraq, with headlines charging abuse.

[4] The Plaintiffs' claims were first filed in state court simply due to difficulties in determining the ownership of the copyrighted photographs. Because some of the Plaintiffs were abroad when the AP story ran, it was necessary to quickly file suit to obtain a forum for injunctive relief. After being contacted by the Plaintiffs' counsel, the AP's counsel indicated the AP had no

(Footnote continues on next page.)

## II. THE COMPLAINT PLEADS THE REQUISITE ELEMENTS OF EACH CLAIM

### A. Standard for Rule 12(b)(6) and Federal anti-SLAPP Motions

On a motion to dismiss under Rule 12(b)(6), the "inquiry begins and ends with [the] [c]omplaint." *Grosso v. Miramax Film Corp.*, 400 F.3d 658, 659 (9th Cir. 2005). The court "must take all factual allegations [of the complaint] as true and must construe them in the light most favorable to the non-moving party." *Id.* "A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its claim which would entitle it to relief." *AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692, 695 (9th Cir. 1999).

Similarly, anti-SLAPP motions in federal court must be treated the same as a Rule 12(b)(6) motion where based on asserted legal deficiencies in the Complaint. *See Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982 (C.D. Cal. 1999). An anti-SLAPP motion may ***not*** be based on a lack of evidence unless the non-moving party has been given the opportunity to conduct discovery. *See id.*

> When a federal court is presented with [an anti-SLAPP motion based on alleged legal deficiencies in the Complaint], it must decide the motion in a manner that complies with the standards set by Federal Rules 8 and 12. Among others, these standards include the requirements that the complaint be read liberally, that all well-pleaded allegations be taken as true, and that dismissal generally be with leave to amend. Standards that put a more onerous burden on the nonmoving party would conflict with Rules 8 and 12. Therefore they cannot apply in federal court.

*Id.* at 982-83 (Internal citations omitted); *see also Verizon Del., Inc. v. Covad Communs. Co.*, 377 F.3d 1081, 1090 (9th Cir. 2004) (grant of motion to strike must be accompanied by leave to amend).[5]

---

(Footnote continued from previous page.)

intention of publishing further photographs, and has not. Once the emergency was over, it was possible to determine the author of the copyrighted works and obtain registrations for them.

[5] The *Metabolife Int'l v. Wornick*, 264 F.3d 832 (9th Cir. 2001) case cited by the AP concurs, and discusses anti-SLAPP motions in the Rule 56 context that are based on evidence. As a result, its discussion of the necessity for "admissible evidence" is irrelevant.

The AP's argument that "a special motion to strike is markedly different from a motion to dismiss" because "to satisfy their ***burden*** under the anti-SLAPP statute, 'it is not sufficient that plaintiff's complaint survive a demurrer,'" is incorrect. "[B]urdens of proof have no place in Rule 12(b)(6) motions or other questions of law. Though burdens of proof are important for evidence-based summary judgment motions, § 425.16 does not alter the standard of the Federal Rules." *Rogers*, 57 F. Supp. 2d at 983-84 & n.6.

**B. The Complaint States Claims for Invasion of Privacy**

As a threshold matter, the AP's talismanic citation to *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998), for the proposition that invasion of privacy claims against the press must fail is belied by the holding of the case. Rather than announcing a general rule that invasion of privacy claims against the press always fail, the *Shulman* Court reversed summary judgment on an intrusion claim. It also explained that: "when a person is involuntarily involved in a newsworthy incident, not all aspects of the person's life" are thereby rendered newsworthy. *Id.* at 223. Instead, the Court is to apply a balancing test to determine newsworthiness. *Id.* at 226. Here, while balancing newsworthiness on a motion to dismiss is inappropriate, the governing law and applicable facts demonstrate that the balance falls in favor of Plaintiffs.

**1. The Four Navy SEALs Stated a Claim for Disclosure of Private Facts**

The elements of a public disclosure invasion of privacy claim are: (1) public disclosure; (2) of a private fact; (3) which would be offensive and objectionable to the reasonable person; and (4) which is not of legitimate public concern. "The latter factor relates to 'newsworthiness' and is subject to a three-part test involving the social value of the published facts, the depth of intrusion into ostensibly private affairs, and whether the person acceded voluntarily to a position of public notoriety." *M.G.*, 89 Cal. App. 4th at 631 (quoting *Shulman*, 18 Cal. 4th at 214.)

**a. Public Disclosure**

The AP admits that it publicly disclosed the private facts—the faces and identifying characteristics of the SEALs—as alleged in the Complaint. *See* Def. Mem. at 7. The SEALs' faces are posted on internet chat sites across the Arab world, accompanied by statements such as: "You all examine closely the appearance and features of this agent/representative and you will

know who is abusing our Iraqi mujahedeen brothers....Goddam them, Goddam them and all those who support them. I swear we have to attack all the Americans everywhere the young and the old---Yes, we are terrorists if terrorism means taking revenge for our dignity." Conklin Decl. ¶ 11.

### b. The SEALs' Identities are Private Facts

The AP argues that the identities of the SEALs were not private facts because: (1) the photographs were stored on the internet, and (2) the acts pictured in the photographs took place in front of other "soldiers and Iraqi prisoners." Def. Mem. at 8.[6] The AP is wrong that either circumstance negates that the SEALs' identities were private facts protected from publication.

First, the AP is incorrect that the identities of the SEALs were not private facts because the photographs were located on a website. The photographs were located on a personal, password-protected website, in a personal gallery. *See* Doe Decl. ¶ 3. Mr. Hettena himself admitted he found the photographs ***on Jane Doe's "personal" webpage***. *Id.* ¶ 5, Ex. 1. As few as two people knew the photographs had been stored on that location. *See id.* And almost nobody viewed any of the photographs prior to the AP publishing them. *See* MacAskill Decl. ¶ 2. It would have been impossible to find the photographs by going to the website without significant discrete information. Doe Decl., ¶ 5. In short, uploading photographs to a personal, password protected webpage does not publicly disclose the identities of the SEALs.

Second, the fact that other SEALs and Iraqi prisoners may have known the identities of the SEALs does not render their identity public. In *M.G.*, Time Warner claimed that the identity of the coaches and children on a convicted child molester's Little League team were not private facts because the team played a public sport and took a team photograph on a public baseball field. *See M.G.*, 89 Cal. App. 4th at 632. The court rejected this argument and held there is a

---

[6] Of course, these factual determinations are inappropriate in deciding a Rule 12(b)(6) motion. The Complaint has pled each element of a public disclosure of private facts claim. *See* Compl., at ¶¶ 58-63.

difference between taking a team photograph for circulation among "family and friends," and publishing it for the world to see. *See id.*, at 633.[7]

Further, the AP's claim that maintaining the SEALs' confidentiality would "pervert the purpose of the privacy tort" is misplaced. The AP cannot seriously be requesting that this Court create new law allowing it to publish the identity of any person in the United States military, covert operative or not, whenever it chooses, regardless of the implications. The AP knows the identities of covert operatives are confidential under United States law. *See* Owens Decl. ¶ 25. In the December 3, 2005 article in which he disclosed the identities of the SEALs in this case, Mr. Hettena quoted a Navy spokesman as stating "[s]ome of these photos clearly depict faces and names of Naval Special Warfare personnel, which could put them or their families at risk." Giving the AP carte blanche to publish the identities of covert forces with impunity is truly the rule that would pervert justice.

**c. Revealing the Identities of Navy SEALs, Knowing it will Endanger their Lives, is Patently Offensive Conduct**

The matter made public, here the identity of the SEALs in connection with alleged abuse, must "be offensive and objectionable to a reasonable person of ordinary sensibilities." *Times-Mirror*, 198 Cal. App. 3d at 1426. It is beyond dispute that a reasonable person would find it offensive and objectionable to have his identity disclosed in a manner that falsely accuses him of abuse and renders his family in danger of being killed by terrorists. *Id.* at 1426, 1428 n.4 (publishing name and endangering murder witness "offensive").[8]

---

[7] *See also Times-Mirror*, 198 Cal. App. 3d. at 1427-28 (fact that "selected neighbors, friends, family members, and officials" knew identity not make public). The *M.G.* court distinguished the *Sipple v. Chronicle Publ'g Co.*, 154 Cal. App. 3d 1040 (1984) case cited by the AP, differentiating between the public fact that a well-known and politically active man was homosexual and the circumstance where relatively private individuals took pictures of themselves in public. *Id.*

[8] The offensiveness of the AP's conduct is heightened by the fact that it ***chose*** to run multiple photographs identifying individual SEALs, notwithstanding that an equal number of the photographs it published showed the AP's claimed abuse but did not identify individuals. Additionally, one photograph obviously shows a bleeding detainee receiving first aid (detainee near refrigerator with SEAL illuminating him while corpsman treats wound), which Mr. Hettena misrepresented to be a photograph showing some form of abuse. Hettena Decl. Ex. A, p. 13.

Nonetheless, the AP argues that "publishing the identities of individuals who are part of newsworthy events is not outrageous, as a matter of law…." Def. Mem. at 8. In so arguing, the AP begs the question of what is "newsworthy," misapplies the concept of newsworthiness, and misstates the out-of-Circuit authority it cites.[9]

**d. Identities are not Per Se Newsworthy[10]**

"[W]hile the general subject matter of a publication may be newsworthy, it does not necessarily follow that all information given in the account is newsworthy. Whether a publication is newsworthy depends upon community mores. If there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court." *Times-Mirror*, 198 Cal. App. 3d at 1428-29 (Internal citations omitted).

"To determine whether an incident is newsworthy a court considers the social value of the published facts, the extent of the intrusion into ostensibly private matters, and the extent to which a party voluntarily assumed a position of public notoriety." *Id.* at 1428. As the *Times-Mirror* opinion explains, the Court must look:

> not to whether the publication of an account of [the alleged abuse] was newsworthy but [] whether the publication of [the SEALs identity] was newsworthy. Applying the three part test to the facts of this case a jury must consider the social value of publishing [the SEALs identity] by balancing the value to the public being informed of the [identity] of a person [allegedly abusing detainees] against the effect publication of [the identity] might have upon [the

[9] *Ross v. Burns*, 612 F.2d 271, 271-72 (6th Cir. 1980), far from holding that publishing a photograph of an undercover police officer would not be actionable as invasion of privacy, does not even analyze the tort. Instead, in discussing an intentional infliction of emotional distress claim, it noted that the lower court had directed a verdict on a privacy claim. The directed verdict was not appealed, and the court did not discuss it or state the reason the lower court granted the motion. Likewise, *Price v. Viking Press, Inc.*, 625 F. Supp. 641, 650 (D. Minn. 1985) discussed the tort of intentional infliction of emotional distress under Minnesota law, noted its narrow scope, and held the publication of the city, found by calling 411, where a known public official lived does not support the cause of action.

[10] Again, this issue is not appropriate for determination on a 12(b)(6) motion. The cases cited by the AP for the proposition that a determination of newsworthiness is a "threshold issue of law for the court" are, again, incorrectly cited. *See* Def. Mem. at 9 (citing *Shulman*, 18 Cal. 4th at 215 (not discussing stage at which newsworthiness determination should be made and affirming summary judgment, not demurrer); *Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 895 (9th Cir. 1988) (affirming 12(b)(6) dismissal of privacy claim where complaint not well-pleaded, and not discussing newsworthiness at all); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123-25 (N.D. Cal. 2002) (not discussing newsworthiness)).

> SEALs] safety and emotional well being. The jury must also consider the seriousness of the intrusion and the extent to which [the SEALs] voluntarily exposed [themselves] to notoriety."

*Id.* at 1429 (bracketed information added). In this case, it is apparent that the SEALs' identities are not newsworthy.[11] No social value attached to publishing their identity. In fact, it is generally a violation of common journalistic ethics and standards of care to publish the identifying characteristics of people who have not been charged with a crime or would be put in danger. *See* McKiernan Decl. ¶¶ 9; 11; Bellows Decl. ¶¶ 9, 14; Harrington Decl. ¶ 4.

On the other hand, the SEALs' safety and emotional well-being has been destroyed by this publication. Some of the SEALs pictured in the photographs were ***on active duty performing dangerous counterterrorism missions in Iraq*** at the time the story ran. *See* Doe Decl. ¶ 8. At the time they were following Government orders to apprehend wanted terrorists in Iraq, their faces were being published throughout the Arab world, with websites calling for their deaths. *See* Conklin Decl. ¶¶ 3-7, 11, 13. Moreover, the SEALs and their families remain in danger and will remain in danger for the foreseeable future. Platt Decl. ¶ 26; Owens Decl. ¶ 24. Many extremist websites are calling for the SEALs' faces to be remembered and for them to be found.[12] *See* Conklin Decl. ¶¶ 3, 11.

---

[11] *See M.G.*, 89 Cal. App. 4th at 635 (faces of coaches and players not newsworthy); *Times Mirror*, 198 Cal. App. 3d at 1429 (jury could conclude identity of witness to murder not newsworthy); *see also Virgil v. Time, Inc.*, 527 F.2d 1122, 1131 (9th Cir. 1975) (jury could conclude facts relating to pro-surfer's private eccentricities not newsworthy); *Diaz v. Oakland Tribune*, 139 Cal. App. 3d 118, 134 (1983) (jury could conclude fact that first female college student body president was a transsexual not newsworthy because fact had little relevance to story); *Capra v. Thoroughbred Racing Assoc.*, 787 F.2d 463, 465 (9th Cir. 1986) (jury could conclude publishing names of persons in federal witness protection program not newsworthy); *Y.G. v. Jewish Hosp. of St. Louis*, 795 S.W.2d 488, 502 (Mo. Ct. App.1990) (identity of people undergoing *in vitro* fertilization and attending reception for new parents not newsworthy even where general subject of *in vitro* fertilization newsworthy); *Vassiliades v. Garfinckel's*, 492 A.2d 580, 589 (D.C. 1985) (before and after photographs of women undergoing plastic surgery not newsworthy where different photographs would be just as informative).

[12] Also militating against newsworthiness is the seriousness of the intrusion. The AP ran photographs with full frontal views of the faces of the SEALs. *See* Hettena Decl. Ex. A. In contrast to *Shulman*, where neither the "full name nor direct display of [the accident victim's face]" were broadcast, here the SEALs are easily identifiable. *See Shulman*, 18 Cal. 4th at 230. Unlike *Shulman* where "[i]t is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact," here the identities of the SEALs could have been easily obscured by black boxes—something well within the bounds of ethical journalism. *See id.* at

(Footnote continues on next page.)

Mr. Hettena argues that he "considered the facial expressions of the SEALs in the photos with hooded and bloodied prisoners to be a central part of their news value." Hettena Decl. ¶ 28.[13] There is no apparent connection between the facial expressions and the allegations of abuse. In any event, no ethical journalist would print these photographs before the SEALs were charged with a crime or if it would put them in danger. *See* Bellows Decl. ¶ 15; McKiernan Decl. ¶ 16. Instead, the AP could have printed photographs showing "hooded and bloodied prisoners" that did not have identifiable photographs of SEALs in them, or taken less than a minute per photograph to alter the images "to preserve the 'facial expressions' of the SEALs but to delete identifying characteristics." McKiernan Decl. ¶ 16. The *M.G.* court, faced with an identical situation, held that "team members' faces should have been concealed" and noted that the intrusion of showing the faces "outweighs the values of journalistic impact and credibility." *See M.G.*, 89 Cal. App. 4th at 635-36.[14]

Finally, the SEALs did not voluntarily expose themselves to notoriety. *Times-Mirror*, 198 Cal. App. 3d at 1429. None of the SEALs even knew the photographs were being stored on Jane Doe's personal webpage. Doe Decl. ¶ 4. Moreover, to the extent the AP argues that the SEALs somehow voluntarily exposed themselves by appearing in the photographs, it reported that many of the photographs were taken for intelligence gathering purposes. Conklin Decl. ¶ 12. And, in

---

(Footnote continued from previous page.)

230; McKiernan Decl. ¶ 15. Alternatively, the AP could have made the ethically prudent decision to print the photographs of alleged abuse that did not disclose identities. *See* Bellows Decl. ¶ 14.

[13] In truth, none of the photographs attached to the Hettena Declaration where SEALs' facial expressions are visible were taken with bloodied prisoners. *See* Hettena Declaration, Ex. A, at pp. 5, 6, and 8.

[14] The AP's so-called policy against "altering" photographs does not excuse its invasion of privacy. An internal policy does not govern responsibilities and liabilities under tort law. *The T.J.* Hooper, 60 F.2d 737 (2d Cir. 1932). Moreover, the AP's policy "is not some sort of iron-clad rule that can never be modified. It is an editor's job to make tough decisions every day. If the AP was convinced it needed to run the photographs attached to the Hettena Declaration with the Article, it should have blurred the identities of the SEALs in the photographs and added in the caption that 'subjects" faces blurred to protect their identity." Harrington Decl. ¶ 6; Bellows Decl. ¶ 16.

any case, taking a photograph for personal use does ***not*** equate to voluntarily relinquishing it for public dissemination. *See M.G.*, 89 Cal. App. 4th at 633.[15]

**e. The AP Has No "Constitutional Privilege" to Invade Privacy**

The AP also argues that the First Amendment bars "truthful publication about matters of public significance." Def. Mem. at 10. It asserts that "plaintiffs do not challenge the truth of the AP report, and given its obvious public significance, plaintiffs cannot state a cause of action for public disclosure of private facts." First, Plaintiffs are not suing the AP for publishing the report, ***but for publishing the faces of the SEALs*** in photographs running with the report, and do dispute its accuracy. Second, "unless it be privileged as newsworthy...the publicizing of private facts is not protected by the First Amendment."[16] *Virgil*, 527 F.2d at 1128; *see also Dietemann v. Time, Inc.*, 449 F.2d 245, 250 (9th Cir. 1971).

Here, the state clearly has an interest in protecting the identity of its covert operatives. 50 U.S.C. § 421; Owens Decl. ¶25. In *Times-Mirror*, the court found the "interest of the state to protect witnesses and to conduct criminal investigations is sufficient to overcome the Times' First Amendment right to publish Doe's name." *See Times-Mirror*, 198 Cal. App. 3d at 1432. Likewise, in *M.G.*, the state had an overriding interest in "prohibiting the disclosure of the identity of both minors and victims of sex crimes." *M.G.*, 89 Cal. App. 4th at 635. There can be no greater state interest than protecting the lives of servicemen and their families.

---

[15] The *Pasadena Star-News* case distinguished *Times-Mirror* by noting under its facts the "newsworthiness" balancing test fell in favor of permitting the publication of a name where the individual's "voluntary and extraordinary actions created the newsworthy event." In any event, the *Pasadena Star-News* case was decided on summary judgment, not at the pleadings stage.

[16] The cases cited by the AP stand only for the limited proposition that "[s]tates may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Smith v. Daily Mail Publ"g Co.*, 443 U.S. 97, 103 (1979); *see also Gates v. Discovery Communications*, 34 Cal. 4th 679, 683 (2004) (same). Here, because the photographs were not obtained from official records, the newsworthiness standard is the only applicable First Amendment limitation on the SEALs" right to recover.

**C. The California Constitutional Right to Privacy is Distinct from Common Law Invasion of Privacy and the AP Presented no Grounds to Dismiss it**

The AP seeks to conflate the analysis of the Four Navy Seals' constitutional right to privacy claim with that of their disclosure of private facts claim, arguing the *Shulman* Court held the torts were co-extensive. Def. Mem. at 7. Defendants are incorrect.[17] California Constitutional privacy, which identifies privacy as among the "inalienable rights," has been repeatedly construed as providing Californians with privacy protections broader than those recognized in the federal constitution. *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 327 (1997); *Urbaniak v. Newton,* 226 Ca.l. App. 3d 1128, 1138 (1991) (elements of common law tort distinct from constitutional claim). While the elements of a constitutional claim are similar to those of the other privacy torts,[18] an important difference is that a "plaintiff...may rebut a defendant's assertion of countervailing interests [necessitating the invasion of privacy] by showing there are *feasible and effective alternatives* to defendant's conduct which have a lesser impact on privacy interests." *Loder v. City of Glendale*, 14 Cal. 4th 849, 891 (1997) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal. 4th 1, 40 (199) (emphasis added).

Here, the AP argues that disclosing the identities of the Four Navy Seals is allegedly necessary to report upon an issue of public interest. Even if so, which is disputed, there were "feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." *Hill*, 7 Cal. 4th at 40. The AP had numerous alternatives to needlessly publishing the identity of the Four Navy Seals. First, it could have chosen to publish the article, but not accompany it with photographs. Second, it could have accompanied the article with photographs

---

[17] Liability may be predicated either upon violation of the common law publication of private facts tort or the constitutional violation, each with their own analysis. *See,.e.g.*, *Egan v. Schmock*, 93 F. Supp. 2d 1090, 1094-95 (N.D. Cal. 2000) (analyzing constitutional right to privacy elements two years following *Shulman*). The Four Navy Seals state a claim under both analyses and pled each element of the constitutional right to privacy tort. *See* Complaint ¶¶ 45-47.

[18] The elements of a constitutional right to privacy claim are : (1) the existence of a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances of the invasion; and (3) conduct by the defendant constituting a serious invasion of privacy. *Loder,* 14 Cal. 4th at 891 (citing *Hill*, 7 Cal. 4th at 39-40).

not identifying individuals. And, finally, it could have blurred the identities of the individuals in the photographs. Any of these alternatives would have ***both*** protected the Four Navy Seals' privacy ***and*** allowed the AP to publish its story.

**D. Jane Doe Stated a Proper Claim for Intrusion**

To assert an intrusion claim, the plaintiff must plead: (1) that the defendant intruded into the plaintiff's solitude; and (2) that the defendant's intrusion would be considered offensive or objectionable to a reasonable person.[19] *Shulman,* 18 Cal. 4th at 231. Doe pled these elements. Compl. ¶¶ 51-54. Moreover, in intrusion claims, rather than any "constitutional protection for newsgathering, one finds the decisional law reflects a general rule of *nonprotection*: the press in its newsgathering activities enjoys no immunity or exemption from generally applicable laws." *Id.* at 238.

**1. An Intrusion Occurred**

"[P]rivacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law....The mere fact that a person can be seen by someone does not automatically mean that he or she can legally be forced to be subject to being seen by everyone." *Sanders v. ABC*, 20 Cal. 4th 907, 915-16 (1999).[20] A user of a website may have a reasonable expectation of privacy in the information she stores there. *See IDX Sys. Corp. v. Epic Sys. Corp.,* 165 F. Supp. 2d 812, 823 (W.D. Wis. 2001) (reasonable litigant could believe

[19] Again, the cases cited by the Defendants are inapposite. *See Salazar v. Golden State Warriors*, 2000 U.S. Dist. LEXIS 2366, * 1-4 (N.D. Cal. Feb. 29, 2000 (no allegation in Complaint that intruded on private place where filmed in public parking lot); *Marich v. MGM/UA Telecomm., Inc.*, 113 Cal. App. 4th 415, 433 (2003) (after jury trial); *Med. Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806, 819-20 (9th Cir. 2002) (following summary judgment).

[20] *See also Dietemann,* 449 F.2d at 249; *Vescovo v. New Way Enters., Ltd.*, 60 Cal. App. 3d 582, 587 (1976); *Huskey v. Nat'l Broad. Co.*, 632 F. Supp. 1282, 1287-88 (N.D. Ill. 1986); *Y.G.*, 795 S.W.2d at 502.

its trade secrets were not generally known or ascertainable even though secrets were published on the internet).[21]

The AP argues that Jane Doe could not have an objectively reasonable expectation of privacy "in photographs posted on a public Internet website, particularly one that is indexed to the Google search engine and can be accessed with no password."[22] Def. Mem. at 12. The AP tells the Court that internet "indexing" is a voluntary act, like listing a work in a library card catalogue, when nothing could be further from the truth. If the Google search engine found Jane Doe's photographs, it did so not by her taking any voluntary action to list her personal webpage. To the contrary, she took actions to ensure that her photographs were shielded from public view. Jane Doe chose a password for her smugmug.com page that protected her photographs from public view.[23] Doe Decl. ¶¶ 2, 3. She believed photographs she posted on the page could only be viewed by people to whom she gave permission. *Id.* at ¶ 2.[24] She told almost nobody the

[21] *See also Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935-36 (9th Cir. 2004) (affirming damages on trade secret and other causes of action where defendant had obtained secrets from plaintiff's web site); *United States v. Geibel*, 369 F.3d 682, (2d Cir. 2004) ("Although Freeman disclosed the confidential information over the Internet, this does not mean he had no expectation of privacy."); *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 21 (1st Cir. 2003) (Internet use does not imply consent to collection of personal information by a third party); *Fraternal Order of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105, 118 (3d Cir. 1987) (limited disclosure does not strip private information from protection against public disclosure).

[22] The criminal cases cited by the AP for its argument that Jane Doe could not have had a reasonable expectation of privacy simply do not apply here. "[D]ecisions discussing [one's] expectations of privacy against government searches are not directly applicable to the common law privacy tort context." *Sanders*, 20 Cal. 4th at 919; *see also Cramer v. Consol. Freightways, Inc.*, 209 F.3d 1122, 1132 (9th Cir. 2000). Moreover, all of the cases cited by the AP concern situations that are factually dissimilar. *See United States v. Gines-Perez*, 214 F. Supp. 2d 205, 225 (D.P.R. 2002) (criminal case; web site with no protective measures); *J.S. ex rel. H.S. v. Bethlehem Sch. Dist.*, 757 A.2d 412, 425 (Pa. 2000) (school expulsion case; web site with no protective measures); *U.S. v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (criminal case; emails "that have already arrived at the recipient"); *see also Konop v. Hawaiian Airlines, Inc.*, 236 F.3d 1035, 1045-46 (9th Cir. 2001) (superseded by 302 F.3d 868 (9th Cir. 2002) and removing dicta regarding expectation of privacy).

[23] After discovery, the trier of fact will test the veracity of Mr. Hettena's story regarding how he obtained access to the photographs.

[24] Additionally, any user of a photo storage site has an objectively reasonable expectation that their photographs are password protected because the default setting for the great majority of photo storage sites automatically password protect access to posted photographs. *See* Conklin Decl. ¶ 16.

photographs were posted, perhaps only her parents. *Id.* at ¶ 3. In fact, Mr. Hettena admits that he located the photographs on her "***personal web page.***" *Id.* at ¶ 6, Ex. 1.

Likewise, based on the smugmug.com Terms of Use, an objectively reasonable user would believe that even if her photographs were inadvertently discovered, the photographs could not be downloaded, much less published worldwide. The Terms of Use prohibit downloading,[25] copying, or commercial use of any portion of the site. It is objectively reasonable for a user to believe that users of the site, all of whom agree to its terms as a condition of access,[26] will abide by them. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 , 403 (2d Cir. 2004) (agreement to web site terms of use inferred by use of web site benefits). The AP's argument that Jane Doe's expectation of privacy in the photographs is unreasonable is belied by the fact that, before the photographs were published by the AP, almost nobody had seen them. MacAskill Decl. ¶ 2.

**2. The AP's Conduct was Highly Offensive**

"A court determining the existence of 'offensiveness' would consider the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1483-84 (1986).

The AP violated numerous statutes, as well as ethical journalistic standards, to access these photographs. First, as set forth below, the AP violated Navy Seal One's copyright by copying and publishing the photographs. Second, the AP violated the smugmug.com Terms of Use. Third, The AP violated journalistic standards of ethics by accessing an admittedly personal

---

[25] The AP argues that the Terms of Use bar copying "the site" without permission, but expressly authorize "caching", which without expert testimony it equates to "copying." Def. Mem. at 13 n.8. This reading of the Terms of Use ignores their clear language stating "This site ***or any portion of this site*** may not be...copied." *See* Conklin Decl. ¶ 15. Moreover, the AP's argument that Mr. Hettena did not make "commercial use" of the photographs, is dead wrong. "[The AP] used the works for a commercial purpose, providing the works to other news reporting organizations in exchange for an annual fee." *Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998).

[26] The AP also argues that Mr. Hettena did not agree to the Terms of Use. Def. Mem. at 13. Again, the Terms of Use state expressly that "If you visit or purchase at smugmug.com, you accept these terms and conditions. Conklin Decl. ¶ 15.

webpage, removing photographs from the webpage, and publishing them without permission. McKiernan Decl. ¶ 21; Harrington Decl. ¶ 3. Finally, the AP arguably violated 50 U.S.C. Section 421, which makes it a felony to disclose the identity of a covert operator. Owens Decl. ¶ 25.

Additionally, the offensiveness of the AP's conduct is heightened by the fact that it was warned about many of these issues after copying, but before publishing, the photographs. Jane Doe told Mr. Hettena that he should not have been on her personal webpage, the photographs were private and password protected, and that he did not have permission to use them. Doe Decl. ¶ 7. She also told him that publishing the photographs could get the SEALs killed. *See id.*

The AP clearly understood the danger that would result by publishing photographs of the SEALs. Mr. Hettena himself wrote that the Navy told him printing the photographs would put the SEALs in danger. Conklin Decl. ¶¶ 4, 6, 13. Likewise, he wrote "out of safety concerns, the AP is not identifying the woman who posted the photos." *See id.* Apparently, the AP initially planned to publish Jane Doe's identity regardless of the danger. Mr. Hettena told her: "I want you to know that ***I argued*** to keep your name out of the story--even though you did not ask this of me--out of concerns for your personal safety." Doe Decl. ¶ 10; Ex. 2 (emphasis added).

The AP argues, citing *Shulman*, that its purpose was to gather news, so its intrusion could not have been "highly offensive" as a matter of law.[27] Def. Mem. at 14. To the contrary, *Shulman* held a jury could find ***intrusion by the broadcast media, even though for the purpose of newsgathering, was highly offensive***. *Shulman*, 18 Cal. 4th at 238 ("Nor can we say as a matter of law that defendants' motive -- to gather usable material for a potentially newsworthy story -- necessarily privileged their intrusive conduct as a matter of common law tort liability....Although defendants' purposes could scarcely be regarded as evil or malicious (in the

---

[27] The *Shulman* Court also noted that "[a] reasonable jury could conclude the producers' desire to get footage that would convey the 'feel' of the event--the real sights and sounds of a difficult rescue--did not justify either placing a microphone on [the nurse] or filming inside the rescue helicopter." 18 Cal. 4th at 240.

colloquial sense), their behavior could, even in light of their motives, be thought to show a highly offensive lack of sensitivity and respect for plaintiffs' privacy").[28]

## III. THE ANTI-SLAPP LAW IS INAPPLICABLE TO THIS CASE BECAUSE IT IS NOT ABOUT CHILLING SPEECH, BUT ABOUT PROTECTING IDENTITIES

"[W]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPPs are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Rogers*, 57 F. Supp. 2d at 974 (quoting *Wilcox v. Superior Court*, 33 Cal. Rptr. 2d 446, 450 (1994)). This is ***not*** a SLAPP suit.[29] The AP's anti-SLAPP motion is nothing more than an attempt to intimidate Plaintiffs into dismissing this case.[30]

The causes of action alleged in the Complaint do ***not*** arise from conduct by the AP "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[31] The causes of action alleged in the Complaint do ***not*** arise from the AP publishing an article about alleged prisoner abuse or publishing any of the photographs not specifically identifying Navy SEALs. *See* Compl. ¶¶ 46, 54, 60. Plaintiffs' claims, instead, arise from the AP's conduct of ***publishing photographs showing SEALs' faces and identifying details***. The AP must demonstrate this conduct was "in

[28] *See also J.P. Turnbull v. ABC*, 2004 U.S. Dist. LEXIS 24351, *17-18 (C.D. Cal. Aug. 19, 2004) (newsgathering motive not insulate offensiveness of hidden camera recording where not integral to story although "most effective way to tell the story").

[29] Even if the anti-SLAPP motion were appropriate as to any one of the privacy claims, which it is not, it should be denied if any of the claims have merit. *See M.G.*, 89 Cal. App. 4th at 636-37 (All causes of action survive anti-SLAPP motion where they are based on same underlying conduct and some have merit); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1002 (2001) (discussing same).

[30] While not mentioning fees in its Memorandum of Points and Authorities, the AP requests attorneys" fees in its Notice of Motion. The AP well recognizes the fact that an award of fees could bankrupt the Plaintiffs in this case, and threatened in correspondence to pursue fees from Plaintiffs if they proceeded with their claims.

[31] Section 425.16(e)(3) applies to statements made in a "public forum," but "[a] newspaper should not be deemed a "public forum" for purposes of Section 425.16." *Condit v. National Enquirer*, 248 F. Supp. 2d 945, 953 (E.D. Cal. 2002); *see also Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1130-31 (2003) (newspaper not public forum); *contra Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468 (2000).

connection with an issue of public interest for reasons other than that they were [published] in a widely distributed publication." *See Condit*, 248 F. Supp. 2d at 945.

In an analogous case, the Eastern District of California held that a defamation lawsuit against the National Enquirer by Carolyn Condit ("Condit"), the wife of former congressman Gary Condit, did not fall under the anti-SLAPP statute. *Id.* at 954. The National Enquirer reported that Condit had phoned Chandra Levy ("Levy") and verbally assaulted her shortly before Levy disappeared. *Id.* at 948. "Several newspapers, including the USA Today, New York Post, and Washington Times, reported the information." *Id.*

In denying the National Enquirer's anti-SLAPP motion, the court held:

> This lawsuit concerns disputed claims over defamation, not the type of meritless case brought to obtain a financial or political advantage over or to silence opposition from a defendant, which California's anti-SLAPP statute is designed to discourage .... Defendant seeks to utilize the anti-SLAPP law to gain immunity from alleged defamation, not to be free of a wrongfully intimidating meritless lawsuit designed to stifle desirable political or public speech.

*Id.* at 954.

Similarly, the causes of action in the Complaint arise from the AP's conduct in disclosing the SEALs' ***identities*** in contravention of both the law and common journalistic standards of practice. McKiernan Decl. ¶ 9; Bellows Decl. ¶ 7; Harrington Decl. ¶ 4; Owens Decl. ¶ 25. Plaintiffs claims arise ***from*** publishing identifying photographs and ***not*** from publishing articles about the Four Navy SEALs' alleged abuse, and so the causes of action in the Complaint do not arise from any conduct in connection with an issue of public interest. *See Gallimore v. State Farm & Cas. Ins. Co.*, 102 Cal. App. 4th 1388 (2002); *State Farm Gen. Ins. Co. v. Majorino*, 99 Cal. App. 4th 974, 977 (2002). The SEALs' ***identities*** are simply not matters of legitimate public interest. *See, e.g.*, *M.G.*, 89 Cal. App. 4th at 636;[32] *Times-Mirror*, 198 Cal. App. 3d at 1429. Moreover, the AP has no First Amendment right to violate copyright law. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

---

[32] While the *M.G.* court found the conduct complained of did fall under the anti-SLAPP statute, it noted the "point [was] nearly conceded by plaintiffs." *M.G.*, 89 Cal. App. 4th at 629. That is clearly not the case here.

The AP itself admits that many of the photographs are for "legitimate intelligence gathering purposes and showed commandos using approved procedures." Conklin Decl. ¶ 12. As a result, the most the AP can argue, which is incorrect, is that the SEALs were violating unnamed Navy Regulations against photographing detainees. Owens Decl. ¶ 18. The AP cannot seriously claim the issue of "public interest" justifying its disclosure of the identities of covert operatives—resulting in worldwide death threats to them and their families—was SEALs taking unauthorized photographs.

As in *Condit*, the AP is seeking to "gain immunity from alleged [invasion of privacy], not to be free of a wrongfully intimidating meritless lawsuit designed to stifle desirable political or public speech." *Condit*, 248 F. Supp. 2d at 954. The AP has not made a *prima facie* showing any of the causes of action alleged in the Complaint arise from acts in furtherance of the AP's right to free speech. In any case, as set forth above, Plaintiffs have pled legally sufficient claims and, as a result, both the AP's Motion to Dismiss and its Motion to Strike should be denied.

## IV. NAVY SEAL ONE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT

### A. Neither the Fair Use Defense nor Rule 8 Provide Bases for Dismissal

As a threshold matter, the proper standard for review (mentioned nowhere by Defendants) is well-delineated in controlling caselaw. Defendants state that "the copyright claim still should be dismissed under Fed. R. Civ. P. 12(b)(6) because AP's report made fair use of the photographs at issue and the plaintiffs can prove no set of facts that would entitle them to relief," citing *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993). (Defs. Mem. at 19.) In truth, *Cervantes* is an employment law case that has nothing to do with copyright law at all, much less the standard for pleading a copyright claim. Moreover, in *Cervantes*, the Ninth Circuit *reversed* a district court's 12(b)(6) dismissal where, as here, there were fact issues that could not be properly resolved at the pleading stage.

The proper standard for considering Defendants' Rule 12 argument is whether the Plaintiffs pled the only two elements required to state a copyright infringement claim. "To properly plead a cause of action for copyright infringement, plaintiff must allege: "(1) ownership of a valid copyright, and (2) copying by the defendant of the constituent and original elements of

the copyrighted material." *Beam Sys., Inc. v. Checkpoint Sys., Inc.*, 1995 U.S. Dist. LEXIS 21495, *4 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *see also MGM Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029. 1034 (C.D. Cal. 2003). Defendants do not dispute that Plaintiffs pled these requisite prima facie elements.[33]

Defendants contend that their *affirmative defense* of "fair use" excuses their infringement. The fair use defense, however, is not appropriate for determination under Rule 12(b)(6).[34] "[W]hile affirmative defenses may be raised in a motion to dismiss, defenses such as the fair use doctrine involve a more detailed analysis of the facts at issue and are best resolved by summary judgment motions or adjudication at trial." *Int-Elect Eng'g, Inc. v. Clinton Harley Corp.*, 1993 U.S. Dist. LEXIS 11510 *5 (N.D. Cal. June 24, 1993) (citing 5A Wright & Miller, Federal Practice and Procedure § 1357 (1990)).[35] Defendants should not be ignorant of this standard given that the AP's nearly identical attempt to claim fair use of a photograph used without permission, arguing that the photograph was an integral part of a story, was rejected by a federal district court as inappropriate for consideration under Rule 12(b)(6). *Mathieson v. Associated Press*, 1991 U.S. Dist. LEXIS 4982 (S.D.N.Y. April 16, 1991) While applying a fair use analysis is not proper at the pleadings stage, Plaintiffs nevertheless briefly respond to the AP's arguments.

### B. The Fair Use Defense does not Protect Defendants' Conduct

The Copyright Act grants exclusive rights to the owner of a copyright to "reproduce, distribute and publicly display copies of the work." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817

---

[33] Rule 8 provides no basis for dismissal. Defendants are on notice of which photographs are at issue – the photographs they stole and published. In a case about the disclosure of identities endangering lives, Defendants miss the mark by complaining that the Navy SEALs should have pled additional specific identifying information in the Amended Complaint.

[34] Again, the cases cited by Defendants provide no support for the standard they urge. *See* Def. Opp. at 19-20 (*Lamb v. Starks*, 949 F. Supp. 753 (N.D. Cal. 1996) (considering summary judgment, not 12(b)(6)); *Kulik Photography v. Cochran*, 975 S. Supp. 812 (holding that court did not have jurisdiction pursuant to Rule 12(b)(2)).

[35] *See also Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2d Cir. 1994); *Video Pipeline, Inc. v. Buena Vista Home Ent't, Inc.*, 210 F. Supp. 2d 552, 569-570 (D.N.J. 2002); *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514; 532 (S.D.N.Y. 2001); *Chicago Sch. Reform Bd. of Trs. v. Substance, Inc.*, 79 F. Supp. 2d 919, 930-32 (N.D. Ill. 2000) *aff'd in part* 354 F.3d 624 (7th Cir. 2003).

(9th Cir. 2003) (citing 17 U.S.C. § 106). Some opportunity for "fair use" of copyrighted materials is permitted, however, "'to promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl 8).

The 1976 Copyright Act codified judicial doctrine permitting fair use and listed four "illustrative" factors to be considered in a fair use analysis, while acknowledging that any fair use analysis requires a case-by-case factual review. *Id.* at 577-578. The four illustrative factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and portion of the copyrighted work used; and (4) the effect upon the potential market or value. 17 U.S.C. § 107. Contrary to the AP's suggestion, however, the four factors are not a *sine qua non* of the fair use defense: "no generally applicable definition is possible, and each case raising the question must be decided on its own facts." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1152n. 4 (1986).

**1. Using a Work for a Commercial Purpose is Presumptively Unfair.**

The first fair use factor discussed by the AP is whether "the purpose and character of the use is of a commercial nature or is for nonprofit educational purposes." *Hustler Magazine, Inc.*, 796 F.2d at 1157. The AP does not mention the well-settled law that, "[i]f the work is used for a commercial or profit-making purpose, the use is presumptively unfair." *Id.* at 1152. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985). "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa State Univ. Research Found., Inc. v. ABC, Inc.*, 621 F.2d 57, 61 (2d Cir. NY 1980). To rebut the presumption, the AP was required to present facts that it did not take the works without paying the customary price. *Lamb*, 949 F. Supp. at 757. The AP did not and cannot do so.

Here, there can be no dispute that there is a customary price for photographs used in the news: the AP pays freelance photographers every day for photographs. Moreover, the Navy

SEALs generally do not allow embedded reporters to take and publish photographs of their covert activities, so that such photographs could be valuable. Platt Decl. ¶ 22; McKiernan Decl. ¶ 21.

The AP attempts to obfuscate the straightforward application of the first factor—whether the work was used for a commercial use for which the creator should have been paid—by misstating the facts and law regarding the concept of "transformative use." Transformative use has no application here. For a use to be "transformative," it must "add[] something new, with a further purpose or different character, altering the first [work] with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. The AP concedes that the photographs show no more than what it is documented on the face of the photographs. Def. Mem. at 9-10. And the AP's cited authority explains that transformative use is not available to a defendant, like the AP, that independently "manufacture[d] the newsworthiness" and attempted to "scoop" the photographer. *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000).[36]

**2. Plaintiff's Original, Creative Work has never been Published**

As a threshold matter, a photograph can be a creative work. *Kelly*, 336 F. 2d at 820. Whether the work is creative or informational, however, depends upon the intent in taking the photograph. *Id.* The AP's contention that ***its use*** was informational is irrelevant. The focus is on whether the work was creative, not the AP's use. *Id.*

The AP is dead wrong when it tells the Court that when works have been made available via the internet, they have been published within the meaning of the Copyright Act. As their own cited authorities explain, "[e]ven where the copyright owner's images appeared on the internet before the alleged infringer began using those images," the second fair use factor can "weigh[] in favor of the copyright owner." *Video Pipeline, Inc. v. Buena Vista Home Ent't, Inc.*, 275 F. Supp. 2d 543, 563 (D.N.J. 2003); *Kelly*, 336 F. 2d at 820 (same).[37]

[36] The First Circuit was careful to reiterate that there is no general newsworthiness exception that permits the use of news-relevant photographs because such an exception "would provide an incentive for the infringer to create "news,"" as well as provide "journalists and news photographers [with] little assurance of being rewarded for their work." *Nunez*, 235 F.3d at 23.

[37] *See also Batesville Services, Inc. v. Funeral Depot, Inc.*, 2004 WL 2750253 (S.D.Ind. 2004) (second statutory factor weighed in favor of finding copyright infringement for photographs posted on the internet).

There is ***no authority*** supporting the bright line rule advanced by the AP that an internet post is equal to publication.[38] The holding in *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002) is inapplicable. The sole issue in *Getaped.com* was statutory damages under the Copyright Act. Recognizing that the copyright owner holds the exclusive right to publication, and that the copyright owner urged that he intended to publish his work on his website, the Court held that the statutory damages could be measured under the standard for published works. *Id.* at 402. This case has no bearing here, where the photographs at issue were not intended to be published, but were posted to a "personal," password protected webpage. Doe Dec. ¶ 3. And *Kelly*, 336 F. 2d at 820, actually reaches the opposite conclusion of the AP. Despite finding that a professional photographer's images had been deliberately posted to several websites before the infringing use, the Ninth Circuit found that the second fair use factor weighed in favor of the photographer. *Id.*

The internet cannot be subject to a single rule regarding whether posted works have been "published" within the meaning of the Copyright Act because Copyright Act "publication" turns on a factual inquiry into how the works are posted (*e.g.* posted to the world wide web or a private host, posting with a user agreement that works are for personal use and not to be distributed, or posting with password protection).[39] The thrust of the published/nonpublished distinction is that the creator of the work has the right to control the first public appearance of his works; therefore, if he has not publicly released his work, the scope of fair use is narrower. *Harper & Row*, 471 U.S. at 564. Here, the copyright owner's photographs were placed, without his knowledge, on a password protected personal internet website. Jane Doe ¶ 4. It is clear that they were not yet published within the meaning of the Copyright Act.

---

[38] In fact, Congress has enacted legislation to ensure that Copyright owners' rights remain protected despite posting to the internet. *See* 17 U.S.C. § 512 ("Digital Millennium Copyright Act").

[39] Publication is defined under the Copyright Act in pertinent part as: "distribution of copies … of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies … to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101.

### 3. The AP Used the Entire Copyrighted Work

Under the third factor, the court must consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. Here, the AP admits it published the photos "exactly as they had appeared on the Internet." (Def. Mem. at 4.) It also admits that it failed to modify the photographs in any way to protect the identities of the soldiers. (*Id.*) Where, as here, there has been wholesale copying of the original, this factor weighs heavily against fair use. *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 109 (2d Cir. 1998).

The AP attempts to claim that because it allegedly only took some of the photographs it discovered on Jane Doe's personal webpage, it took only a small portion of the copyrighted work. Copyright law affords protection for ***each*** of the 1800 photographs on the site, however, and five of the photographs have been individually registered. Each photograph is independently copyrightable and must be treated as a separate work under the fair use analysis. 17 U.S.C. § 102(a)(5).

### 4. The Photographs have Value.

As a threshold matter, the AP claims the market value factor supports fair use because Plaintiffs did not allege a specific market for the photographs. Harm to the market is not an element of a copyright infringement action. If this were a motion for summary judgment, which it is not, it would be the AP's burden to prove no relevant market. *Campbell*, 510 U.S. at 593.

Because the AP cannot prove there is no relevant market (the AP's publication establishes that the media was a potential market), the AP argues that because the Plaintiffs did not want the AP to publish the photographs, reveal their identities, and endanger their lives, it follows that the Plaintiffs would have never published the photographs and therefore there is no market value. The AP's argument fails.

"[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the ***potential*** market for the copyrighted work.'" *Harper & Row,* 471 U.S. at 568 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)). The AP cannot contend that it is established as a matter of law there is no potential

market for Plaintiff's pictures because the AP's use of the photographs establishes the opposite: the media (before the AP stole and published the photographs) was a market. McKiernan Decl. ¶ 22.

Copyright encompasses "not only the choice of whether to publish at all, but also the choice of when, where, and in what form to first publish a work." *Harper & Row*, 471 U.S. at 564. As explained by the Second Circuit:

> [T]he need to asses the effect on the market for [the copyrighted work] is not lessened by the fact that their author has disavowed any intention to publish them during his lifetime. First, the proper inquiry concerns the "potential market" for the copyrighted work. Second, [the owner] has the right to change his mind.

*Salinger v. Random House,* 811 F.2d 90, 99 (2d Cir. NY 1987). The fact Plaintiffs did not plan to disclose their identities to the world by publishing the photographs in the same manner the AP published them does not justify its unauthorized exploitation.[40] As the copyright owners, Plaintiffs are "entitled to protect [their] *opportunity* to sell" the copyrighted works. *Id.*

Moreover, the fourth factor is disjunctive: "the potential market for *or* value of the copyrighted work." 17 U.S.C. § 107. Copyright law has long recognized a privacy value in choosing *not* to publish a work. 4 Harv. L. Rev. 193 (1890). As Justices Warren and Brandeis said, "the value of the production is found not in the right to take the profits arising from the publication, but in the peace of mind or the relief afforded by the ability to prevent any publication at all." *Id.* This long standing principle remains the law. *Chicago Board*, 354 F.3d at 934. In sum, the AP did not make a fair use of Plaintiff's copyrighted works.

## V. CONCLUSION

The AP's Motion should be denied for the reasons set forth above.

Dated: April 22, 2005

MORRISON & FOERSTER

By: [signature]
James Huston
Attorneys for Plaintiff

---

[40] By publishing the photographs in an article that implied the photographs depicted wrongful acts, the AP has destroyed any positive associations of uses Plaintiffs intended for their photographs. *See Chicago Sch. Reform Bd.*, 79 F. Supp. 2d at 934.