USDC SCAN INDEX SHEET



TKL 4/25/05 12:49

3:05-CV-00555 FIVE NAVY SEALS V. ASSOCIATED PRESS

*14*

*DECL.*

Dockets.Justia.com

JAMES W. HUSTON (BAR NO. 115596)
DAVID C. DOYLE (BAR NO. 70690)
KRISTINA M. HOY (BAR NO. 220167)
CHARLES S. EVENDORFF (BAR NO. 187119)
MORRISON & FOERSTER LLP
3811 Valley Centre Drive, Suite 500
San Diego, California 92130-2332
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

FILED
05 APR 21 AM 1:59
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Attorneys for Plaintiffs
FOUR NAVY SEALS AND JANE DOE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FOUR NAVY SEALS AND JANE DOE,

Plaintiffs,

v.

ASSOCIATED PRESS, a New York corporation; SETH HETTENA, an individual; and Does 1 through 50, inclusive,

Defendants.

Case No. 05 CV 0555 JM (JMA)

**DECLARATION OF E. ALAN PLATT IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STRIKE**

Date: May 6, 2005
Time: 11:00 a.m.
Ctrm: 6
Judge: Jeffrey Miller

I, E. Alan Platt hereby declare:

1. I have personal knowledge of the facts contained herein and if called to testify regarding these facts, could so testify competently.

2. I am Vice President Operations, of Telemus Solutions, a company specializing in security through intelligence.

3. I am a graduate of the United States Naval Academy and was a Navy pilot on active duty after graduation. I received a master of science degree from the University of West Florida.

4. I served for many years as a senior intelligence officer at the highest levels of the Central Intelligence Agency and the National Security Agency. I have extensive experience in the areas of global operations management, international business development, national security policy, counterintelligence, and personal and technical security.

5. I routinely advise individuals, governments and corporations on international security and personal security regarding terrorism, counterterrorism, intelligence gathering, and defense systems. I have managed a global multi-billion dollar enterprise consisting of several thousand civilian and military employees.

6. In my intelligence work, I was the Chief of Station in four locations, participating in several of the agency's premiere intelligence operations.

7. I have extensive experience in African and Middle Eastern affairs.

8. I served as the executive assistant to the deputy director of the CIA. I have a Top Secret/SCI and compartmented security clearance with polygraph updated as of July 2000 (current).

9. My areas of expertise are global operations management, intelligence policy, clandestine operations, counterintelligence, personal and technical security, strategic alliances, national security policy, and information operations.

10. From 1999 to 2000, I was the Assistant Deputy Director for Operations of the National Security Agency. From 1997 to 1999, I was the Chief of Station at one of the CIA's largest stations.

11. From 1996 to 1997, I was Deputy and Acting Chief of the DCI Counterintelligence Center for the CIA. In that role, I reformed the CIA's counterintelligence infrastructure, policies, and practices. I supervised the CIA's effort to uncover a United States government spy.

12. From 1994 to 1996, I was Deputy Chief of the Special Activities Division of the CIA. I revamped the CIA's covert action infrastructure and streamlined the approval process. I initiated the integration of CIA capabilities with DoD Special Operations.

////

13. A copy of my current résumé is attached hereto and incorporated herein as Exhibit 1.

14. I have been asked by counsel for the Navy SEALs and Jane Doe to give opinions regarding the implications of the compromise of identities of SEALs who were on operational capture missions in conjunction with intelligence agencies in Iraq.

15. Seth Hettena, who wrote the articles that I have reviewed and obtained the photos in question in this litigation, states correctly the Navy's position that the identities of the SEALs are closely guarded. This is especially true for those assigned to SEAL teams that are actively operating with intelligence agencies in capture and covert operations in a war zone. It is my understanding that the SEALs involved in the photographs in question were conducting operations capturing insurgents and terrorists in Iraq in conjunction with various intelligence agencies.

16. It is extremely important to guard the association of units, individuals, and missions working with the intelligence community and some foreign governments. When SEALs and other special operations forces work for or in conjunction with other government agencies (OGAs), there is careful attention paid to protecting their identities.

17. Disclosing the identity of military personnel operating with intelligence agencies abroad can be criminal in nature. The impact though on the individuals is even more dramatic than the breach of security in identifying them.

18. Once digital photographs of SEALs on operational missions were published by the news media, they may be downloaded, and used by anyone for any purpose. Many of the SEALs' photographed in this case are clearly identifiable through the photographs themselves.

19. Those SEALs who are not immediately identifiable through the photographs, can be identified through the use of digital photography and biometrics, resulting in enhanced images produced for those who wish to identify them. Those enhanced images will never be in the newspaper, but they could very well be in the hands of those who wish to do them harm. The technology is not exclusive to government intelligence agencies. The software necessary to modify photographs to enhance them is generally available to the public.

20. It is well known in the war on terror that Navy SEALs are among the most effective and deadly force against insurgents and terrorists. They conduct operations such as the ones reflected in these photographs nearly ever night in Iraq and elsewhere.

21. Notably absent from public discussion and from the press are photographs of the SEALs in operation. They do not take or allow embedded photographers to accompany them. They generally do not allow outsiders to participate or observe in actual operations.

22. It has been asserted repeatedly by officials of the United States government, that there are al-Qaeda cells operating within the United States. Government statements to that effect are attached hereto as Exhibits 2-5. It is clear that a retaliatory strike against Navy SEALs, who have been one of the most effective anti-terror weapons in the war on terror, would be a devastating blow to the American psyche and the military. To have that attack inside the United States would be even worse. At the very least, it would be a preventable, personal tragedy.

23. Thus, the identity of Navy SEALs involved in counterterrorism missions is closely guarded, and should be treated with the highest deference by everyone, including the media.

24. It is my understanding from the articles from Hettena and from other sources that these photographs have now appeared all over the Arab media, on Al Jazeera, on billboards in Cuba, and even on websites in San Diego. This is the unfortunate yet predictable outcome of recklessly disclosing the faces of special operators involved in dangerous missions.

25. Since their identities have been compromised, their ability to work safely and securely in the covert world of counterterrorism, or even for an American intelligence agency, is also compromised. Because their digitized photographs are now all over the Arab media, their ability to operate in those environs is suspect.

26. An additional real impact to these SEALs arising directly from the AP's decision to publish their faces will be the ongoing danger to their families, regardless of whether they remain in the Navy, become civilians, or move to new cities, they are now identifiable and trace-able. In this era of asymmetric warfare, terrorists use surprise as their key ingredient. If identities of special operations personnel are known, their movements and activities can be monitored and precluded or compromised.

27. Because of that their career path to proceed from being a Navy SEAL into an American intelligence agency, or even a government contractor working closing with intelligence agencies or independently, has been dramatically affected. Nor are they likely to have equal success in further covert operations in any ongoing Navy career. It cannot be remedied as those digital photographs will live on forever.

28. There are many independent contractors who do intelligence consultation work and even something similar to covert operations who hire SEALs or other intelligence operatives. Those companies are unlikely to hire someone for high risk covert operations whose identity was widely available in the print and broadcast media in the Arab world.

29. Moreover, the terrorists network is expanding. They have been joining forces with Asian, European, South American, Mexican and Russian mafia assets, as well as other terrorists' networks. Protecting the identities of those few we ask to go after them is of paramount importance. To have disclosed their identities unnecessarily has endangered their lives, and compromised their future work life.

30. The terrorists against whom we are fighting are careful about their own operational security. They plan missions and are willing to wait years for its execution. Their memories are long, and the passage of time is not an indication of safety.

31. I know the risks inherent in having one's identity disclosed personally. My name was released in a country in which I was operating covertly. An assassination attempt was made on my life, which resulted in a co-worker (because of mis-identification by the assassin), being shot in the head and crippled for life.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in McClean, Virginia, on April 20, 2005.

E. Alan Platt

# E. Alan Platt

1328 Titania Lane
McLean, VA 22102
703 556 6726 • eaplatt@erols.com

## CAREER SUMMARY

Senior Intelligence officer in the Central Intelligence Agency with a proven record of integrity, achievement and excellence. Exceptional leadership and decision-making skills in high risk environments. Managed a global, multi-billion dollar enterprise consisting of several thousand civilian and military employees. Chief of Station in four locations, participating in several of the Agency's premier intelligence operations. Expertise in African and Middle Eastern affairs. Fluent in French. Served as Executive Assistant to the Deputy Director of the CIA. **Top Secret/SCI and compartmented security clearances with polygraph updated in July 2000.**

## EXPERTISE

- Global Operations Management
- Leadership Development
- International Relations
- Congressional Relations
- National Security Policy
- Information Operations
- Intelligence Policy
- Clandestine Operations
- Counterintelligence
- Personal and Technical Security
- Customer Relations Management
- Strategic Alliances

## PROFESSIONAL EXPERIENCE

**Central Intelligence Agency**
**National Security Agency**
**DCI Staff**

**Assistant Deputy Director for Operations, NSA** **1999-2000**

- Played a leadership role in the largest mission element of the U.S. Intelligence Community.
- Helped lead and focus the U.S. global SIGINT enterprise to serve a broad set of customers, including senior U.S. government policymakers, military commanders and law enforcement officials.
- Helped formulate the vision and implement the strategies for transformation within the Operations Directorate at NSA.
- Spearheaded strategic partnerships with other Community elements, especially CIA.

**Chief of Station at one of CIA's Largest Stations** **1997-1999**

- Established several new collection platforms for acquiring and disseminating critical intelligence for the war fighter and policymaker on a variety of key national security issues.
- Provided guidance and supervision to officers operating throughout the world in a variety of hostile environments.
- Developed the strategy and began implementation for a station of the future, teaming with other agencies and operating at the speed of global businesses.
- Founded a leadership seminar for mid-level officers that has become the Directorate's premier training course.

**Deputy and Acting Chief of the DCI Counterintelligence Center** **1996-1997**

- Reformed the CIA's counterintelligence infrastructure, policies, and practices.
- Supervised the CIA's effort to uncover a USG spy.
- Led all mitigation planning efforts prior to the arrest and file reviews and damage assessments after the arrest.
- Developed and implemented core operational security and counterintelligence procedures and awareness programs in collaboration with Congress, the National Security Council and other Community partners.

**Deputy Chief of Special Activities Division** **1994-1996**

- Revamped the CIA's covert action infrastructure and streamlined the approval process.
- Led an effort to modernize and expand covert action tools, applications and processes.
- Launched an innovative and unique multi-million dollar collection program designed to disseminate intelligence directly to policymakers and the war fighter in real time.
- Developed and promoted a professional career track for covert action specialists.
- Initiated the integration of CIA capabilities with DoD Special Operations.

**Chief of Station for Three Area Divisions** **1988-1994**

- Executed successfully all roles and responsibilities as Chief of Station, one in hostile, war-like and life-threatening conditions.
- Increased effectiveness and efficiency of all operational activities at every command.
- Dealt effectively and decisively with belligerent government factions on force protection issues.
- Conceived, planned, and conducted technical, intelligence, counterintelligence and counterterrorist operations.
- Coordinated U.S. policies with senior officials of four foreign governments during periods of political and economic instability.
- Submitted substantive assessments to senior USG officials during crises with direct impact on foreign policy decisions.
- Supervised and mentored dozens of officers to enhance their operational and leadership skills resulting in their personal improvement and recognition.
- Formally recognized for exceptional performance at each Station.

**Special Assistant/Executive Assistant to the DDCI** **1986-1988**

- Reviewed, prioritized, and brought to the Deputy Director's attention all reports, memoranda and actions addressed to his office, making recommendations and drafting responses as appropriate.
- Attended all meetings between the Deputy Director and his subordinates, recording and following up actions on the Deputy Director's behalf.
- Advised the Deputy Director on a wide range of issues, especially those pertaining to the DO.

**Deputy Chief of Station/Chief of Base in Three African Division Stations** **1980-1986**

- Directed all CIA activities in-country in the Division's largest and most active station.
- Planned and implemented the evacuation of several hundred U.S. government officials and civilians in 48 hours under threat of terrorist attack.
- Conducted two unique, high risk special operations at the direction of the NSC.
- Prepared budget and operational evaluation reports.
- Coordinated administrative, strategic planning, and human resources projects.
- Supervised, trained, and mentored several dozen junior officers.

## AWARDS and HONORS

| | |
|---|---|
| • Vice Presidential Commendation | 1986 |
| • Meritorious Unit Citation for Special Targeting and Collection Program | 1993 |
| • Intelligence Medal of Merit | 1994 |
| • Intelligence Commendation Medal | 1996 |
| • Balkans Service Award | 1997 |
| • Operations Directorate Donovan Award, CIA | 1998 |
| • Meritorious Unit Citation for Exceptional Operational Activities | 1999 |
| • Exceptional Civilian Service Award, NSA | 2000 |
| • Operations Directorate Medallion, NSA | 2000 |

## MILITARY SERVICE

Naval Aviator, United States Navy

## EDUCATION

- BS Degree, United States Naval Academy
- MS Degree, University of West Florida
- CIA Intelligence Fellows Program

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdonline.com

**INTERIOR IMMIGRATION ENFORCEMENT RESOURCES - MICHAEL W. CUTLER**

1,698 words
10 March 2005
Congressional Testimony by Federal Document Clearing House
English
(c) 2005 CQ Transcriptions, Inc. All Rights Reserved.

Statement of Michael W. Cutler Former Special Agent, I.N.S.

Committee on House Judiciary Subcommittee on Immigration, Border Security, and Claims

March 10, 2005

... When he testified before the Senate Select Committee on Intelligence last month, FBI Director Robert S. Mueller III testified that he is ``very concerned`` about the lack of data on a network of **al Qaeda** ``sleeper`` **cells** in the **United States**. He went on to say that, ``Finding them is a top priority for the FBI, but it is also one of the most difficult challenges.``

Sleeper agents are not like cicadas; they do not simply slip into our country and then burrow into a hole for months or years awaiting their instructions to emerge to carry out a deadly terrorist attack. Sleepers are, in fact, aliens who, upon entering our country, manage to hide in plain sight by finding a job, attending a school or doing other such ``ordinary things`` that do not call attention to them. Someone once said that an effective spy is someone who could not attract the attention of a waitress at a greasy spoon diner. The same can be said of an effective terrorist. It is vital that we regain control of our borders and the entire immigration bureaucracy and enforcement program if we are to protect our nation against terrorists and criminals. This requires that we have an adequate number of law enforcement officers who are dedicated to this critical mission. ...

**SCOTT MCCLELLAN HOLDS WHITE HOUSE REGULAR NEWS BRIEFING - NEWS BRIEFING**

6,473 words
26 May 2004
Political Transcripts by Federal Document Clearing House
English
(c) 2004 FDCH / eMedia, Inc. All Rights Reserved.

(CORRECTED COPY)

WHITE HOUSE REGULAR NEWS BRIEFING

MAY 26, 2004

SPEAKER: SCOTT MCCLELLAN, WHITE HOUSE PRESS SECRETARY

...QUESTION: Has the president been advised that Al **Qaida** operatives are actually within the borders of the United States plotting attacks?

MCCLELLAN: Well, we receive, as I pointed out, a constant stream of intelligence reporting. And the recent intelligence reporting has pointed to the possibility of attacks during the time period I mentioned.

In terms of the possibility of terrorists being here in the United States, we have to work under the assumption that there are terrorists here.

MCCLELLAN: And the intelligence reporting we have seen from time to time indicates that there may well be people in place ready to carry out attacks. But we do not have specific information about the timing or target or nature of those attacks.

QUESTION: Is there anything more concrete than an assumption or belief that they may actually be...

MCCLELLAN: Well, certainly there are individuals that were Al **Qaida** operatives that we've apprehended in the past. And certainly before the September 11th attacks, there was an **Al Qaida cell** in the **United States** plotting to carry out that attack. And we know the terrorists continue to want to harm America or harm American citizens abroad. And that is why we have to work under the assumption that there are operatives here in the United States wanting to carry out attacks.

QUESTION: But you have nothing definitive that there actually is a **cell** that you may have...

MCCLELLAN: That's why I said that we received reporting from time to time that suggests that there are operatives in the United States. And we have to work under that assumption. And that's what we will continue to do as we remain very vigilante in the way we approach these threats and try to stop these threats from happening in the first place.

QUESTION: So if you believe that there are Al **Qaida** operatives in the United States, does that point to a failure of systems to keep them out of this country? Were they here prior to the initiation of those systems designed to keep people out of this country? And how does it change the calculus for how you...

MCCLELLAN: Well, we are a free society. And we know that there certainly are terrorists that would like to try to enter America to carry out their evil acts. And that's why we have taken unprecedented steps to strengthen our homeland against possible attacks. We have taken a number of steps to make sure that we are prepared to respond to any attacks and to prevent attacks from happening in the first place. And certainly we've improved our intelligence gathering and sharing...

QUESTION: One last thing for you: Is there information that there are more Al **Qaida** operatives in the U.S. than were, say, at Christmas or last summer or in previous periods when we were concerned about.

MCCLELLAN: Yes, again, they're going to be talking about some specific individuals that we believe

pose a danger to the United States that may have information about possible plots to carry out attacks or may be involved in planning attacks.

QUESTION: (inaudible) a long time, haven't we?

MCCLELLAN: Again, it's not necessarily that they're in the United States, but it's people that we should be aware of. ...

^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^

**JAMES COMEY HOLDS JUSTICE DEPARTMENT NEWS BRIEFING - NEWS BRIEFING**

3,704 words
5 August 2004
Political Transcripts by Federal Document Clearing House
English
(c) 2004 FDCH / eMedia, Inc. All Rights Reserved.

JUSTICE DEPARTMENT NEWS BRIEFING

AUGUST 5, 2004

SPEAKERS: JAMES COMEY DEPUTY ATTORNEY GENERAL DEPARTMENT OF JUSTICE

GARY BALD ASSISTANT DIRECTOR FOR COUNTERTERRORISM FBI

CHRIS WRAY ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION DEPARTMENT OF JUSTICE

GLENN SUDDABY U.S. ATTORNEY, NORTHERN DISTRICT OF NEW YORK

... QUESTION: Given the communications between Mohammed Khan and at least one individual in the U.S., how concerned are you that there may be active **Al Qaida cells** in the **U.S.**? And should we expect to have more arrests in the next few weeks?

COMOY: I can't comment on the second part of the question.

The first part of the question, we're obviously very concerned. We've been trying to communicate, and I think we have communicated effectively over the last couple of months, that there is a serious threat out there, that this is the real deal, and that we are working very hard to disrupt.

It's always something we worry about, whether there might be operatives here in the United States, and it's something that we work very aggressively on. ...

^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^

**JOHN ASHCROFT TESTIFIES BEFORE 9/11 COMMISSION - COMMITTEE HEARING**

12,177 words
13 April 2004
Political Transcripts by Federal Document Clearing House
English
(c) 2004 FDCH / eMedia, Inc. All Rights Reserved.

ATTORNEY GENERAL ASHCROFT TESTIFIES BEFORE THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES

APRIL 13, 2004

...ASHCROFT: After I became attorney general in February 2001, it became clear that the FBI's computer technology and information management was in terrible shape.
...Finally, the commission should study carefully the National Security Council plan to disrupt the **Al Qaida network** in the **U.S.** that our government failed to implement fully 17 months before September 11th.

ASHCROFT: This NSC millennium after action review declares that the United States barely missed major terrorist attacks in 1999 and cites luck as playing a major role.

Among the many vulnerabilities in homeland defenses identified, the Justice Department surveillance and FISA operations were specifically criticized in the after-action assessment of the millennium approach. They were criticized for what were identified as glaring weaknesses.

It is clear from the review that actions taken in the millennium period should not be the operating model for the U.S. government. In March of 2000, the review warns the prior administration of a substantial Al **Qaida** network and affiliated foreign terrorist presence within the U.S. capable of supporting additional terrorist attacks here.

Furthermore, fully seventeen months before the September 11th attacks, the review recommends disrupting the Al **Qaida** network and terrorist presence here, using immigration violations, minor criminal infractions, tougher visa and stronger border controls.

These are the same aggressive, often-criticized law enforcement tactics that we have unleashed for 31 months to stop another Al **Qaida** attack. These are the same tough tactics we deployed to catch al Mahri (ph), who was sent here by Al **Qaida** on September 10th, 2001, to facilitate a second wave of terrorist attacks on Americans.

Now, despite the warnings and the clear vulnerabilities identified by the NSC in 2000, no new disruption strategy to attack the **Al Qaida network** within the **United States** was deployed. It was ignored in the Justice Department's five-year counterterrorism strategy. I did not see this highly classified review before September 11th. It was not among the 30 items upon which my predecessors briefed me in transition. It was not advanced as a disruption strategy to me during the summer threat period by the NSC staff, the staff which had wrote the review more than a year earlier.

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdonline.com

Testimony
*United States Senate Committee on the Judiciary*
**DOJ Oversight: Terrorism and Other Topics**
**June 8, 2004**

**The Honorable John Ashcroft**
Attorney General , United States Department of Justice

---

http://64.233.167.104/custom?q=cache:W7RartYsshUJ:www.fas.org/irp/congress/2004_hr/060804ashcroft.html+al+qaeda+cells&hl=en&ie=UTF-8

STATEMENT OF JOHN ASHCROFT
ATTORNEY GENERAL BEFORE THE COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE
OVERSIGHT OF THE DEPARTMENT OF JUSTICE:
TERRORISM AND OTHER TOPICS
JUNE 8, 2004

Good morning, Mr. Chairman and Members of the Committee.

It is useful, from time-to-time, for those of us in government to remind ourselves why we are here, and what we are pursuing. Today,more than most times in the life of our nation, the answer should beclear: The first priority of government is to protect the lives and liberties of the people. The United States Department of Justice is pressing this cause forward with tireless energy and with marked success.

Fighting Terrorism

For 32 months, the Justice Department has been using every tool and every tactic in the arsenal of the justice community to stop terrorismCfrom aggressive enforcement of the criminal code to the deployment of the new and critical tools of the USA Patriot Act. We have usedCand we will useCevery lawful means to deter, disrupt and destroy terrorist threats.

This powerful strategy of prevention has borne impressive results. For more than two years, we have not seen a major terrorist attack on U.S. soil.

For example:

-Our ongoing war on terrorism has resulted in criminal charges against 310 individuals, with 179 convictions to date.
-We have broken up terrorist cells from Virginia to Washington State, from Florida to New York, from Oregon to North Carolina.
-We have launched 70 investigations into terrorist financing.
-And in cooperation with the Treasury Department, these investigations have resulted in the freezing of over $139 million in assets.

http://www.fbi.gov/congress/congress03/mefford062703.htm

**FBI.gov**

**Testimony of Larry A. Mefford, Assistant Director, Counterterrorism Division, FBI**
**Before the United States Senate**
**Terrorism, Technology and Homeland Security Subcommittee**
**June 27, 2003**
**"The State of the Terrorist Threat Facing the United States"**

...We know this: The Al Qaeda terrorist network remains the most serious threat to U.S. interests both here and overseas. That network includes groups committed to the "international jihad movement," and it has demonstrated the ability to survive setbacks. Since September 11, 2001, we believe that Al Qaeda has been involved in at least twelve terrorist attacks against the United States and our allies around the world. This fact requires that we continue to work closely with our partners to fight Al-Qaeda in all its forms both here and overseas....

...We know that the Al Qaeda network maintains a presence in dozens of countries around the world, including the United States....

...On September 13, 2002, five members of a suspected Al Qaeda cell were arrested in Lackawanna, New York. They were charged with "providing, attempting to provide, and conspiring to provide material support and resources to a designated foreign terrorist organization." In addition, a sixth member was rendered to the United States from Bahrain in mid-September 2002, pursuant to an arrest warrant, and was charged with providing material support to Al-Qaeda....

This is Google's cache of http://www.fas.org/irp/news/2002/09/ag092402.html as retrieved on Apr 16, 2005 00:46:06 GMT.
Google's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/custom?q=cache:ohIFSXjqCk4J:www.fas.org/irp/news/2

*Google is not affiliated with the authors of this page nor responsible for its content.*

**Attorney General Addresses Threat Level Status Questions**
**Press Conference**
**Tuesday, September 24, 2002**

Q General Ashcroft, just to change the subject for a moment. Earlier today, you and Governor Ridge lowered the threat advisory level. Can we read into that that the United States is any safer today than it was on September 10th? And then secondly, could you just talk about what role the arrests of the six Buffalo men played in your decision?

ATTY GEN. ASHCROFT: Well, we believe that the threat level should be at the -- what's called the "elevated" level. We believe that an assessment of all the intelligence information and the reporting that we have indicates that that would be the appropriate place for that level.

We had raised that level, and I think from this podium I indicated why, as a result of an overall assessment based on intelligence data, which factored in some very troublesome things, including as well the anniversary of the September 11th date.

Factored in were some threats overseas which were relatively specific, and the inference that if al Qaeda was to be active in variety of settings overseas, it might be likely that they would be active in the United States.

Obviously, factored into that was the fact that we also had an awareness of activity that demanded our attention in this country.

Now, since that time, we have asked the intelligence community on a regular basis, as we always do, as is our matter of course, daily to provide us with indications of what kind of traffic they are encountering, and what kind of risk or threat there seems to be. And it is clear that we have made arrests in Buffalo, we've made arrests in Bahrain, we've made arrests in Pakistan.

We had things that were disrupted in the Southeast Asia region. And it

was based on those kinds of incidents and the information provided by the intelligence community that led us to say to the American people we will return from a high risk assessment posture to an elevated.

Now, I want to emphasize that we are not saying there is no risk. We still think there is an elevated level of risk. We still believe that al Qaeda is an international network; that it still has the reach that makes it global in scope and nature; that we know from them that when we work hard, we disrupt their activities, and when citizens are alert, we disrupt their activities.

We believe that based on the information as I mentioned, the activities I mentioned, the intelligence provided to us by the intelligence community, that it was appropriate to recategorize the risk at the elevated level rather than the high level. And yes, in part, that's a result of the fact that we have been having some success in our pursuit of those individuals who have been associated with the international terrorist movement.

But I just would again note that we consider the risk to still be an elevated risk; it's a very serious risk, and we ask for citizens to remain alert, and that people continue to try and work together with governments, not just ours, but around the world, to make sure that we minimize terrorist threats.

Yes, sir?

Q Attorney General, on that same topic, both you and Governor Ridge have said that the government believes there are sleeper cells of al Qaeda still waiting to get operational in the United States. Is that still true, or has this recent activity disrupted that --

ATTY GEN. ASHCROFT: We have no reason to believe that the United States is absent al Qaeda-associated individuals.

We believe it is an organization which is still bent on injuring America and Americans, that it is worldwide in scope. We have not lost sight of the fact that tens of thousands of individuals were trained by al Qaeda and that they are associated with, obviously, other individuals who didn't find their way to training facilities of al Qaeda in the Middle East. So I don't want anything that I have said to be misconstrued to indicate in any way somehow that there is an absence of al Qaeda threat in the United States. We don't believe that. We believe that it was appropriate to restate the threat based on the assessment of the current threat situation from a high threat to an elevated threat.

Q Do you still believe that there are sleeper cells in the United States waiting to go operational?

ATTY GEN. ASHCROFT: I believe that there are al Qaeda operatives in the United States who are assets to the al Qaeda network around the world. And if I, obviously, had specific information about an operation that they were about to carry out, believe me, I would be taking action in regard to those specific individuals.

Yes, sir.

Q Sir, today we heard from the JIC regarding the FBI. It painted a fairly

dismal picture of the FBI in the runup to 9/11 of last year. Can you assure the American public that the necessary reforms have taken place at the FBI so they feel confident that the FBI and the Justice Department is doing as much as they can to combat al Qaeda and other terrorist organizations?

ATTY GEN. ASHCROFT: The walls that once separated the FBI from other intelligence agencies, for example, were walls created by the Congress and governmental entities quite some time ago. If you'll think back to when the Foreign Intelligence Surveillance Act was brought into existence, in the 1970s, there was a -- perhaps an unwarranted myth that somehow you could separate domestic matters from international matters and that intelligence gained at the international -- in the international arena wouldn't be relevant to things happening domestically and vice versa.

These walls that separated these agencies prohibited the kind of cooperation which we now know is essential. That's one of the reasons in the very few days after September the 11th we went to the Congress and said we must adjust this. We must pass the USA Patriot Act, which fosters communication across these agency lines. I have personally gone beyond that to say about the FBI that no longer are you restrained from doing what other law enforcement agencies are doing, you have a responsibility to keep your ears open, your eyes open, if need be, surf the web, go to public places. You don't have the authority to invade private spaces that are protected, but you must go to public places and think carefully about what we can do to prevent terrorism.

Obviously, at the FBI Director Mueller has stood up, has created a new intelligence or analysis aspect of the FBI with this in mind. So structurally, the Congress has helped us take aside those walls which had been put in place congressionally in the 1970s.

Now, some of those things are still being worked out. As it relates to the full implementation of the Patriot Act, the Justice Department is appealing a judicial ruling that might impair some of the collaboration and cooperation that would exist between these agencies when it relates to the use of this information freely for both preventative work to prevent terrorism, and prosecutorial work to send those who might be involved in terrorism into detention or punishment. We're going to continue to work that way as aggressively as we can. And I am grateful that the Congress has disassembled a wall once constructed in the Congress that provided a barrier or a blockage that kept the kind of information from flowing freely that we need to have flowing.

Q Do you support Senator Lieberman's proposal for a blue ribbon 9/11 commission?

ATTY GEN. ASHCROFT: The administration has indicated that it endorses the idea of a commission to review and find out if there are additional ways that we can learn from what happened in 9/11 so as to improve our capacity to prevent terrorism.

STAFF: Last question.

Q General, you mentioned the indictment of the members of FARC last March. I'm wondering if any of these have ever been arrested or extradited, or we've made -- progress has been made on this issue?

(Off mike conversation.)

ATTY GEN. ASHCROFT: Yes. Carlos Bolas I believe was apprehended in Suriname. And he remains in the custody of the United States pursuant to the indictments that were announced I believe last March -- did we say that?

MR. : Correct.

ATTY GEN. ASHCROFT: -- regarding FARC.

Thank you all very much.

---

Source: http://www.usdoj.gov/ag/qa092402.htm

**U.S. SENATOR RICHARD G. LUGAR (R-IN) HOLDS HEARING ON IRAQ TRANSITION (PART I) - COMMITTEE HEARING**

33,117 words
20 April 2004
Political Transcripts by Federal Document Clearing House
English
(c) 2004 FDCH / eMedia, Inc. All Rights Reserved.

U.S. SENATE COMMITTEE ON FOREIGN RELATIONS HOLDS A HEARING ON IRAQ TRANSITION (PART I)

APRIL 20, 2004

...LUGAR: Thank you, Senator Chafee.

Senator Boxer?

BOXER: ...

I have here a book called, "The Network of Terrorism" put out by this administration's State Department. And on this page -- this was right after 9/11. It was October. "Countries where Al **Qaida** or affiliated groups have operated. There are 42 countries here. Iraq isn't mentioned.

The United States of America is mentioned. So if you believe the administration, there were more **Al Qaida cells** in **America** than there were in Iraq. ...

---

**PATRIOT ACT REAUTHORIZATION: SECTION 203 (B) AND (D) - MICHAEL MCCAUL**

2,016 words
19 April 2004
Congressional Testimony by Federal Document Clearing House
English
(c) 2004 CQ Transcriptions, Inc. All Rights Reserved.

Opening Statement of Michael McCaul U.S. Representative

Committee on House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security

April 19, 2005

...My experience in the Justice Department after the wall came down was profound and dramatically improved. As Chief of Counter- Terrorism I spearheaded the efforts of the Joint Terrorism Task Force. No longer did the barriers of communication exist. Indeed, the FBI's foreign counterintelligence agents and the intelligence community were full partners at the table. For the first time, FBI intelligence files were reviewed by Criminal Division prosecutors and agents. In addition, criminal files and grand jury materials, previously non-disclosable under Rule 6(e) were now available in intelligence cases. Our greatest task was to identify and locate the terrorist **cells**. One of the tools we used to achieve this goal was through the use of National Security Wiretaps or FISAs (Foreign Intelligence Surveillance Act).

Many of the crimes prosecuted in the Justice Department may not appear to be ``terrorist`` related. They include fraudulent documents, alien smuggling, money laundering, as well as weapons and drug violations. For instance, in the case of Ramzi Yousef, the perpetrator of the '93 World Trade Center Bombing; if we had pursued his immigration violation as aggressively as it would be today, perhaps the first **Al Qaeda cell** in the **United States** would have been disrupted.

In addition to FISAs, the Patriot Act provides many other tools for law enforcement in the war on terrorism. First, the PATRIOT Act updated the law to the technology. No longer will we have to fight a digital-age battle with antique weapons - legal authorities left over from the era of rotary telephones.

Next, it promotes efficiency by providing for nationwide search warrants in terrorism cases. Prosecutors and investigators save valuable time because they are able to petition the local federal judge who is most familiar with the case and who is overseeing the nationwide investigation.

While most of the matters I worked on since the PATRIOT Act remain classified, one example where these provisions in the PATRIOT Act were extremely helpful was in a case involving allegations of a terrorist attack on July 4th, 2003. In late June, we received intelligence from a specific and credible source that a terrorist attack was going to occur on the 4th of July in the State of Texas. At the same time, we also received E- mails from an internet chat room from an individual named ``Apostasy Hears Voices`` who threatened to commit terrorist act at numerous locations throughout the United States as a member of an unknown terrorist **cell**. Specifically, the individual threatened that on the 4th

of July 2003, significant locations in Austin, Texas, Washington D.C., New York, Miami, Charlotte, San Francisco, Seattle, and Portland would be attacked by terrorists. The Voice stated, ``Well I have planned a little event for July 4th. . .Roasted Americans on Independence Day. It will be the second largest terrorist demonstration in U.S. history.`` He described himself as having the name ``Ali Aussie`` a student a the University of Texas who has been on a ``mission`` for four years on a student visa as a member of a **cell**. He stated that ``each **cell** acts independently for the most part so that if one **cell** gets caught, the other **cells** are not compromised which is consistent with how Al **Qaeda** operates. He concluded with the following words, ``I did enjoy watching Americans burn alive in the WTC event, BBQ Americans.``

...There has been much talk from critics of the PATRIOT Act regarding allowing many of the information sharing provisions in the law. Having served under its provisions before and after the bringing down of the ``Wall`` and the implementation of the PATRIOT Act, I can envision no bigger National security mistake than to go back to the way things were. Section 203(b) closed a dangerous gap between criminal investigations and counterterrorism. Each restriction on information sharing makes it more difficult for investigators to connect the dots to prevent terrorist attacks. If this section were to expire, US officials would be allowed to share certain foreign intelligence information with foreign intelligence services like MI-5 and the Massad but not with our own CIA.

This section has been used by the Department of Justice on a regular basis and has been instrumental to the increased coordination and information sharing between intelligence and law enforcement that has taken place over the last three and a half years. This provision has been used to help officials break up terror **cells** within the US, such as in Portland, Oregon and Lackawanna, NY. ...

^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^