USDC SCAN INDEX SHEET

Five Navy Seals, et al v. Associated Press, et al

Doc. 1

TKL 4/25/05 12:54

3:05-CV-00555 FIVE NAVY SEALS V. ASSOCIATED PRESS

*19*

*DECL.*

Dockets.Justia.com

JAMES W. HUSTON (BAR NO. 115596)
DAVID C. DOYLE (BAR NO. 70690)
KRISTINA M. HOY (BAR NO. 220167)
CHARLES S. EVENDORFF (BAR NO. 187119)
MORRISON & FOERSTER LLP
3811 Valley Centre Drive, Suite 500
San Diego, California 92130-2332
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

Attorneys for Plaintiffs
FOUR NAVY SEALS AND JANE DOE

FILED
05 APR 21 AM 1:59
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOUR NAVY SEALS AND JANE DOE,<br><br>Plaintiffs,<br><br>v.<br><br>ASSOCIATED PRESS, a New York corporation; SETH HETTENA, an individual; and Does 1 through 50, inclusive,<br><br>Defendants. | Case No. 05 CV 0555 JM (JMA)<br><br>**DECLARATION OF SCOTT MC KIERNAN IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STRIKE**<br><br>Date: May 6, 2005<br>Time: 11:00 a.m.<br>Ctrm: 6<br>Judge: Jeffrey Miller |

19

I, Scott Mc Kiernan, declare:

1. I have personal knowledge of the facts in this declaration and if called upon I could and would competently attest to them.

2. I have over thirty years of wide-ranging experience in photojournalism. In those years I have worked as a photographer, photo editor and agent. I obtained a Bachelor of Fine Arts from the Hartford Art School in 1977, and later studied at the School of Visual Arts, the Rhode Island School of Design, and the News School of Social Research. In my early career, I covered page one stories for major magazines such as *Paris Match*, *Stern*, *Newsweek* and *People Weekly*. In the eighties, I photographed everything from human interest to war, and averaged three-hundred assignments annually. I also have worked for the television shows Dateline and EXTRA in line production, or assisting in finding the sources for various stories.

3. In 1995, I founded ZUMA Press ("ZUMA"), which is currently one of the largest independent editorial photo agencies in the world. I remain a Director and one hundred percent owner of ZUMA. In that capacity I oversee a staff of over thirty people, represent approximately nine-hundred photographers all over the world, about thirty major picture agencies, and over a dozen major newspapers such as the San Diego Union Tribune, the Toronto Star, and the Sacramento Bee. Almost every day I make decisions regarding whether to run certain photographs.

4. I also have taught "Cutting-edge Photojournalism" at the University of California, Los Angeles, for 3 years. I have spoken at numerous trade events, including four appearances at FotoFusion, a weeklong workshop where leading editors, photographers, and agents gather for a conference and workshop.

5. Given that the Associated Press ("AP") is one of the largest media organizations in the world, I make it my professional practice to be aware of events concerning the AP. For instance, when a major news story breaks I often review websites, such as Yahoo, where AP stories run to see how they have covered the story.

6. I have reviewed the article written by Seth Hettena dated December 3, 2004 ("the Article") for the AP, reviewed the photographs that were released on the newswire with the

Article, and read the Declaration of Seth Hettena in Support of Motion to Dismiss and Strike ("Hettena Declaration") submitted in this action.

7. Journalists adhere to a set of commonly understood standards of ethics and professional practices. Based upon my thirty plus years of experience, set forth above, I believe that Hettena and the AP have violated these standards in multiple regards.

8. In the first instance, the Article states that the U.S. military had launched an investigation into the photographs accompanying the Article. I understand that, as set forth in the Hettena Declaration, a follow up article written by Mr. Hettena stated that the Navy's initial assessment was that many of the photographs "were taken for legitimate intelligence gathering purposes and showed commandos using approved procedures." Moreover, I understand that none of the individuals in the pictures accompanying the Article have been charged with any crime.

9. Common journalistic ethics and standards of care generally prohibit publishing the identifying characteristics, including photographs, of suspects unless they have been charged with a crime.

10. These ethical standards exist for exactly the purpose demonstrated by the facts of this case—the persons appearing in the photographs accompanying the Article were not charged with a crime, but have now been irrevocably associated with prisoner abuse.

11. Likewise, commonly accepted journalistic ethics and standards of care require journalists to refrain from disclosing identifying details of person who can be put in danger by the disclosure, whenever possible. Mr. Hettena expressed an understanding of this rule, and followed it in practice, by not disclosing the identity of Jane Doe. The Article notes that "[o]ut of safety concerns, the AP is not identifying the women who posted the photos."

12. Mr. Hettena and the AP also understood that printing photographs of the SEALs could put them in danger, but chose to ignore their ethical duties by printing them anyway. The Article states specifically that "[t]he Navy goes to great lengths to protect the identities and whereabouts of its 2400 SEALs—which stands for Navy, Sea, Air, Land—many of whom have classified counterterrorist missions around the globe. 'Some of these photos clearly depict faces and names of Naval Special Warfare personnel, which could put them or their families at risk

[according to a Navy spokesman].'" Moreover, I have reviewed an article written by Mr. Hettena on September 29, 2004 entitled "Navy keeps tight lid on SEAL identities", which states that the Navy had refused a Freedom of Information Act request filed by the AP for the identities of different SEALs [who ***had*** been charged with crimes] and that "[t]he military is usually loath to divulge details of the operations of its special forces, which are being used worldwide to fight terrorists." Nonetheless, the AP published the photographs at issue clearly identifying the SEALs.

13. The Hettena Declaration speaks at length about the fact that the Abu Ghraib scandal had made photographs relating to prisoner abuse "newsworthy." This fact compounds Mr. Hettena and the AP's ethical violation. They should have understood that printing photographs of SEALs in a story stating they could be the "earliest evidence of possible abuse of prisoners in Iraq" would guarantee wide coverage, including throughout the Arab world. As a result, this wide coverage would itself compound the danger to the SEALs. The fact of the Abu Ghraib scandal is just one more reason ***not*** to print these photographs—these SEALs were tied into a worldwide scandal notwithstanding that they apparently did nothing wrong. Printing the story without accompanying photographs, or just the photographs not clearly showing the identities or faces of the SEALs, would have assured this result did not occur.

14. The Hettena Declaration also states that the AP has a policy to not "doctor" or "alter" news photographs. Hettena Declaration, at ¶25. The AP likely also has a policy, or should have a policy, not to print photographs that could put lives in danger, particularly when the people in the photographs have not been charged with a crime. As a result, if the AP was intent upon publishing the Article, the responsible and ethical course would have been for it to not print the photographs when running the Article. Then, if charges were brought against any of the individuals in the photographs, the AP could have run the photographs (assuming it was unconcerned about violating the copyright laws).

15. Moreover, a distinction exists between "altering" photographs and obviously putting a black rectangle or mosaic over someone's face to make them unrecognizable. For instance, a notorious National Geographic photograph "moved" one of the Egyptian pyramids to

make it appear in the photograph where the photographer chose, but not where it really was. Likewise, recently, Newsweek was soundly criticized for altering a photograph of Martha Stewart by "photo shopping" it to put her head on another person's body so that it could run a story about her leaving prison, while she was still in prison. I, and almost all news organizations, consider this type of alternation unethical. On the other hand, putting a black rectangle in a photograph to obviously remove a person's identifying characteristics to protect their privacy or protect them from harm is a different issue, ethically permissible, and used in practice. Nobody could be faulted for obviously protecting an identity in this manner out of concern for the subject of the photograph.

16. Mr. Hettena notes that he "considered the facial expressions of the SEALs in the photos with hooded and bloodied prisoners to be a central part of their news value." Hettena Declaration, at ¶ 28. Had the AP chosen to value the safety of the SEALs over its "policy" of not altering photographs, it would have been an easy matter to obscure identifying details but preserve the "facial expressions" of the SEALs. Attached to this Declaration are three of the photographs distributed with the Article and attached to the Hettena Declaration, with the original photographs attached. *See* Exhibits 1, 2, and 3. An assistant of mine has altered these photographs to preserve the "facial expressions" of the SEALs but to delete identifying characteristics. These alterations took approximately one minute for each photograph. If the AP were intent upon running the story with these photographs, it should have taken one minute to obviously hide the identities so that anyone would know they were altered. If the AP were still concerned about hiding the identity, it could have added a caption to the photograph stating that it had been digitally altered.

17. The technique of using a mosaic or black rectangle to hide identities is common practice in the broadcast media. Thus, on shows such as COPS, the identities of suspects are generally not shown unless they have been charged with a crime or given their permission to the broadcast.

18. The AP appears to have "jumped the gun" by publishing the photographs with the Article, notwithstanding that none of the SEALs in the photographs had been, or has been,

charged with any crime. It is possible the AP's rush to publish the photographs was a reaction to the embarrassment it suffered by being "late" publishing photographs from the Abu Ghraib scandal. The New Yorker and New York Post both publishing Abu Ghraib photographs first, which resulted in a "buzz" in media circles about the AP losing its edge. The AP's failure to follow commonly understood journalistic ethics by publishing the photographs at issue in this case could have been an attempt to assure it broke the story first.

19. Moreover, I would be surprised if Mr. Hettena followed the AP's own internal copyright guidelines, and certainly did not follow generally accepted journalistic ethical standards, for "sourcing" photographs. "Sourcing" is the practice of determining who took a photograph, and generally owns the copyright, and then obtaining permission to publish the photograph. Mr. Hettena should have been aware that he did not have the permission of the person who took the photographs to publish them. He admits that he was told by the woman who posted the photographs that she did not take them. Hettena Declaration, at ¶ 19. In my work I often find obtaining the identity of an author difficult but, nonetheless, would never publish a photograph without making every effort to locate the author. Publishing the photograph without "sourcing" it is both an ethical violation and an invitation to a copyright infringement lawsuit. I would be very surprised if the AP did not have a set of written guidelines that requires its reporters to obtain permission to use photographs, or outright buy the photograph, from the people who have taken them.

20. Likewise, copying photographs from websites, whether or not password protected, is not standard practice in journalism and violates commonly understood journalistic ethics. I, and any ethical journalist, should consider that photographs on even publicly available websites are protected by the copyright laws. I understand that the AP is arguing that it is legally permissible for it to take the photographs at issue, which it found on a website, and publish it in the newspaper. If accepted, this argument would turn general media practice, including sourcing photographs, on its head. I am sure that the AP does not agree that if one of its reporters posted a photograph he took on a website that one of its competitors, such as Reuters, could take the photograph and use it in the print media, as long as the competitor considered it "newsworthy."

21. Each of the photographs attached to the Hettena Declaration has value, and a market exists for them, although I again note that an ethical journalist would not publish them given the SEALs depicted in the photograph have not been charged with a crime and could be put in danger. It is my general understanding that the SEALs almost never allow journalists to "embed" with them on missions, so that pictures of SEALs in action are more valuable than photographs of less covert military operatives. Moreover, the value of these photographs could increase in the future or over the life of the photograph, depending on whether the individuals pictured or SEALs in general, for instance, become more famous than is currently the case. But, given that the AP has already published the photographs attached to the Hettena Declaration, any market for their sale has been diminished and, if they could be sold, they would likely sell for much less than they otherwise would have.

22. I note that a number of the photographs attached to the Hettena Declaration ran in media subscribing to the AP's services with the notation [AP Photo], [AP], or [Associated Press]. This designation, while not a formal copyright registration symbol, is used by many, if not most, media outlets to denote copyright ownership. As a result, it appears that the AP is asserting it owns the copyright to these photographs and seeking to prevent others from using them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in LAGUNA BEACH, California on April 20th, 2005.

Scott Mc Kiernan





BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdonline.com





BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdonline.com


add to cart
batch add
view cart
Internet


add to cart
batch add
view cart
Internet